DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
SARA J. EISENBERG, State Bar #269303
Chief of Strategic Advocacy
JAIME M. HULING DELAYE, State Bar #270784
Deputy City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:     (415) 554-4633
Facsimile:     (415) 554-4715
E-Mail:        sara.eisenberg@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>ALEX M. AZAR II, Secretary of U.S. Department of Health and Human Services; ROGER SEVERINO, Director, Office for Civil Rights, Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and DOES 1-25,<br><br>　　　　Defendants. | Case No. 3:19-cv-2405<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      For decades, the Office of Civil Rights ("OCR") in the United States Department of Health and Human Services ("HHS") worked to reduce discrimination in health care.  It took bold steps to end practices such as segregation in health care facilities, categorical insurance coverage denials of care for transition related services, and insurance benefit designs that discriminate against people who are HIV positive.  Over the past two years, however, OCR has turned this legacy on its head.

2.      Most recently, on May 2, 2019, OCR submitted regulations entitled, "Protecting Statutory Conscience Rights in Health Care; Delegations of Authority" for publication in the Federal Register (hereafter, the "Final Rule").[1]  In the Final Rule, OCR appropriates language from civil rights statutes and regulations that were intended to remedy discrimination, and applies it in a manner that will, in fact, *increase* discrimination and disparities in healthcare.

3.      The Final Rule requires the City and County of San Francisco ("City" or "San Francisco")—in any and all circumstances—to prioritize providers' religious beliefs over the health and lives of women, lesbian, gay, bisexual, or transgender people, and other medically and socially vulnerable populations.  If San Francisco refuses to comply, it risks losing nearly $1 billion in federal funds that support critical health care services and other vital functions.

4.      This is a perversion of OCR's mission, it is unlawful, and San Francisco will not abide it.

5.      San Francisco recognizes and respects that an individual's religious beliefs, cultural values and ethics may make that person reluctant to participate in an aspect of patient care.  It does so by providing accommodations to those providing direct care where possible.  But while the City supports the legitimate conscience rights of individual health care professionals, the exercise of these rights must be balanced against the fundamental obligations of the medical profession and the right of *all* patients to receive quality health care.  Worse, the Final Rule would define San Francisco's policy

---

[1] A copy of the HHS-approved document that was submitted to the Office of the Federal Register for publication is attached to this Complaint as Exhibit A.

that seeks to accommodate individual's religious freedoms—in accordance with Title VII—as a violation.

6.     San Francisco thoughtfully engages in this balancing and reflects a deep commitment to basic civil rights and patient care, while complying with existing federal law.  OCR's Final Rule does not.  The Final Rule is unconscionable and unlawful.  It should be struck down in full.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction under 5 U.S.C. Sections 703-706 (Administrative Procedure Act) and 28 U.S.C. Sections 1331 (action arising under the laws of the United States) and 1346 (United States as a defendant).  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201(a) and 2202 *et seq*.

8.     San Francisco timely submitted detailed comments on the proposed rule.

9.     The Final Rule constitutes final agency action and is therefore judicially reviewable within the meaning of the Administrative Procedure Act.  5 U.S.C. §§ 704, 706.

10.     Venue properly lies within the Northern District of California because Plaintiff, San Francisco, resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this District.  28 U.S.C. § 1391(e)(1).

## INTRADISTRICT ASSIGNMENT

11.     Assignment to the San Francisco or Oakland Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the acts or omissions that give rise to this action occurred in the City and County of San Francisco.

## PARTIES

12.     Plaintiff San Francisco is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

13.     Defendant Alex M. Azar II is the Secretary of the United States Department of Health and Human Services ("HHS").  He is sued in his official capacity.  Secretary Azar is responsible for implementing and fulfilling HHS's duties under the United States Constitution and the Administrative Procedure Act ("APA").

14.     Defendant Roger Severino is the Director of the Office for Civil Rights ("OCR") at HHS.  He is sued in his official capacity.

15.     Defendant HHS is an agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint.  OCR is an entity within HHS.

16.     Does 1 through 25 are sued under fictitious names.  Plaintiff San Francisco does not now know the true names or capacities of said Defendants, who were responsible for the alleged violations, but pray that the same may be alleged in this Complaint when ascertained.

## FACTUAL ALLEGATIONS

### I.     San Francisco's Public Health System

17.     The mission of the San Francisco Department of Public Health ("SFDPH") is to protect and promote health and well-being for all in San Francisco.  SFDPH is dedicated to reducing health disparities and providing inclusive care to *all* patients, operating facilities, clinics, and programs committed to this mission.

18.     For example, SFDPH established Gender Health SF to provide access to transgender surgeries and related education and preparation services to eligible transgender adult residents. Currently, SFDPH also provides a range of health services to transgender residents such as primary care, prevention, behavioral health, hormone therapy, specialty and inpatient care.

19.     SFDPH strives to achieve its mission through the work of two main branches—the Population Health Division and the San Francisco Health Network.

### A.     The San Francisco Health Network

20.     Through the San Francisco Health Network ("SFHN"), SFDPH administers a complete heath care system including primary care for all ages, dental care, emergency and trauma treatment, medical and surgical specialties, diagnostic testing, skilled nursing and rehabilitation, and behavioral health to residents of, and visitors to, San Francisco, and within the county jail system.

21.     SFHN includes two hospitals:

a)     Zuckerberg San Francisco General Hospital ("ZSFG") is a licensed general acute care hospital and trauma center owned and operated by the City and County of San Francisco. ZSFG delivers over one thousand babies a year, has been at the forefront of HIV/AIDS care from the

beginning of the AIDS crisis, and provides inpatient medical and psychiatric treatment. ZSFG also routinely provides both first- and second-trimester abortion care, including medication abortion, and has on-site ultrasound and interpretation services.

The hospital provides care for approximately one in eight San Franciscans a year, regardless of their ability to pay. As the City's safety net hospital, ZSFG provides the highest-quality services, including to many patients covered through Medi-Cal (California's Medicare program). As the only level one trauma center serving a region of more than 1.5 million people, it provides life-saving emergency care to individuals and victims of mass tragedies like airplane crashes and natural disasters. With the busiest emergency room in San Francisco, ZSFG receives one-third of all ambulances in the City, and treats nearly four thousand patients with traumatic injuries, annually. Many of ZSFG's programs focus on providing life-saving care in emergency situations.

ZSFG is one of University of California San Francisco's ("UCSF") primary teaching hospitals, where medical residents train under UCSF faculty and City staff. ZSFG also trains nurses, including in undergraduate and graduate RN, Advanced Practice Nursing, Vocational Nursing, Psychiatric Tech, Medical Assistant, Certified Nursing Assistant, Sterile Processing Technician, Scrub Technician, clerical and phlebotomy programs.

b) Laguna Honda Hospital provides a full range of skilled nursing services to adult residents of San Francisco who are disabled or chronically ill, including specialized care for those with chronic wounds, head trauma, stroke, spinal cord and orthopedic injuries, HIV/AIDS, and dementia.

22. In addition to these two hospitals, SFHN includes over fifteen clinics throughout the community where patients can access health care services, including primary care, pediatric care, vaccinations, phlebotomy, asthma care, cardiology, HIV prevention and treatment services, dermatology, physicals, dental care, cancer care, family planning, and prenatal care.

23. The Maternal, Child and Adolescent Health ("MCAH") Section of SFDPH also offers a wide range of services to patients through SFHN. MCAH focuses on the most vulnerable children and families, filling what would otherwise be a serious public health gap. Its aim is to reduce health

disparities and improve health outcomes by strengthening the public health systems and services that address the root causes of poor health.

24.    For example, the Family Planning and Preconception Health Program ("FPPHP") offers a wide range of services to patients through SFHN, including: reproductive life planning; reproductive health exams; birth control counseling and prescriptions; emergency contraception; preconception health screening and education; pregnancy tests, counseling, and referral; testing and treatment for sexually transmitted infections; testing and counseling for HIV; and sexual health education and counseling.  FPPHP offers these services at no or low cost to women, men, and adolescents in the City and County of San Francisco.

25.    MCAH also supports young women during pregnancy and families during the early years of childrearing with an evidence-based home visiting program—the Nurse Family Partnership— and through a revamped group-centered model for young women who may not have had consistent linkages with health care services.

26.    Behavioral Health Services ("BHS") is also part of the comprehensive SFHN.  BHS operates the County Mental Health Plan and provides San Franciscans with a robust array of services to address mental health and substance use disorder treatment needs.  Treatment services include: early intervention/prevention; outpatient treatment (including integrated medical and behavioral health services); residential treatment; and crisis programs.

27.    The Transitions Division of SFHN serves severely mentally ill individuals who have multiple complex characteristics—including mental health issues, being medically compromised, and those with cognitive impairments.

28.    The Managed Care Section oversees the contracts under which the SFHN provides medical and mental health care to members of managed care programs including those operated by the San Francisco Health Plan, which is the government entity that administers the Medi-Cal managed care plan for the City and County of San Francisco, and by private insurance plans.

29.    SFHN is also the lead entity in the Whole Person Care Pilot designed by the State of California to serve the multiple medical and mental health care needs of adults experiencing homelessness and of high users of multiple systems.

**B.     Population Health Division**

30.     SFDPH also includes a Population Health Division ("PHD").  This division addresses public health concerns, including consumer safety, health promotion and disease prevention, and the monitoring of threats to the public's health.

31.     PHD consists of ten integrated branches that work together to assess and monitor the health status of San Francisco and implement traditional and innovative public health interventions. For example:

- Applied Research, Community Health Epidemiology, and Surveillance coordinates data collection, processing, management, analysis and interpretation related to health and morbidity in San Francisco.

- Bridge HIV is a global leader in HIV prevention, research, and education.  Operating as a clinical trials unit within SFDPH, Bridge HIV conducts innovative research that guides global approaches in HIV prevention.  Its heritage in the early fight against HIV/AIDS has made it a trusted and renowned resource for understanding HIV infection and disease.

- Community Health Equity and Promotion includes the core public health functions of informing, educating and empowering communities.  Through the use of comprehensive approaches across the spectrum of prevention, the Branch plans, implements, and evaluates prioritized community initiatives, including promoting active living, decreasing HIV, sexually transmitted infections, viral hepatitis, and the effects of trauma.

- Disease Prevention and Control integrates core public health communicable disease functions, along with specialty care and treatment, and laboratory diagnostics.  It is responsible for interacting with SFDPH Health Delivery Systems in order to coordinate and maximize disease screening and other prevention activities in primary care and the hospitals.

- And Emergency Medical Services Agency ("EMS") manages and prepares for all types of medical emergencies in San Francisco.  Among other things, they direct, plan, monitor, evaluate, and regulate the San Francisco EMS System in collaboration with system and community providers.

## II.     Congress's Regulation of Religious Refusals In Health Care

32.     Over the years, Congress has enacted numerous federal statutes concerning refusals to provide healthcare services due to religious objections.  OCR references several of these statutes as being the subject and basis of the Final Rule.  The statutes relied upon by OCR are collectively referred to as the "Federal Health Care Conscience Laws."  As summarized below, these laws focus largely on abortion, but some also include sterilization procedures, assisted suicide, and advance directives, among other types of medical care.[2]  San Francisco fully complies with all of these laws.

### A.     The Church Amendments

33.     Under the Church Amendments—a series of laws passed in the 1970s—government entities are prohibited from using certain federal funds as a basis to require that individuals "perform or assist in the performance" of any sterilization procedure or abortion if doing so would be contrary to religious beliefs or moral convictions.  42 U.S. § 300a-7.  Similarly, receipt of federal funds cannot be used to require entities to make their facilities or personnel available for any sterilization procedure or abortion if the procedure is otherwise prohibited by the entity based on religious beliefs or moral convictions.  And entities that receive certain federal funds cannot "discriminate" in employment, promotion, termination, or the extension of staff or other privileges because a provider "performed or assisted in the performance" of a lawful sterilization procedure or abortion or refused to do so based on religious beliefs or moral convictions.  *See id.*

### B.     The Weldon Amendments

34.     The Weldon Amendment is an appropriations rider that was first passed in 2004 and has been included in the Labor, Health and Human Services, Education, and Related Agencies Appropriations Act every year since.  It states that none of the funds appropriated in the Act may be made available to government entities that discriminate against any "institutional or individual health care entity" because the entity "does not provide, pay for, provide coverage of, or refer for abortions."  *See, e.g.*, Consolidated Appropriations Act of 2009, Pub. L. No. 111-117, 123 Stat 3034, § 508(d)(1).

---

[2] In addition to the statutes summarized below, OCR also relies upon a handful of other statutes. *See* 45 CFR § 88.3.

35.     The Weldon Amendment defines "health care entity" to mean "an individual physician or health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan." *Id.* § 508(d)(2).

## C.     The Coats-Snowe Amendment

36.     The Coats-Snowe Amendment prohibits government entities that receive federal financial assistance from discriminating against "health care entities" (including physicians and those in health professional training programs) that refuse to undergo training to perform abortions, refuse to provide referrals for abortions or abortion training, or refuse to make arrangements for those activities. 42 U.S.C. § 238n(a).

37.     The Amendment defines "health care entity" to include "an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions."  *Id.* § 238n(c)(2).

## D.     The Affordable Care Act

38.     The Patient Protection and Affordable Care Act ("ACA") included a number of health care conscience provisions.

39.     Section 1303 of the ACA affirms that health plans are not required to cover abortion services as part of the essential health benefits package, and that qualified health plans cannot discriminate against providers or facilities because of their unwillingness to provide, pay for, provide coverage of, or refer for abortions.  42 U.S.C. § 18023.

40.     The individual mandate includes a religious conscience exemption that covers organizations or individuals that adhere to established tenets or teachings in opposition to acceptance of the benefits of any private or public insurance.  26 U.S.C. § 5000A.

41.     Finally, Section 1553 prohibits government entities that receive federal financial assistance under the ACA from discriminating against a health care entity because of an objection to providing items or service related to assisted suicide.  42 U.S.C. § 18113.

### E.    Medicaid Or Medicare Statutes

42.    Under a statutory provision related to state-administered Medicaid programs, Medicaid managed care organizations cannot be compelled to provide, reimburse for, or cover counseling or referrals that they object to on moral or religious grounds (as long as the organization makes its policy clear to prospective enrollees).  42 U.S.C. § 1396u-2(b)(3)(B).

43.    And although 42 U.S.C. § 1396a(w) generally imposes advanced directive requirements on state-administered Medicaid programs, it also makes clear that this does not override any state law that "allows for an objection on the basis of conscience for any health care provider."  *Id.* § 1396a(w)(3).  And 42 U.S.C. § 14406 clarifies that the advanced directives requirements do not require a provider "to inform or counsel any individual regarding any right to obtain an item or service furnished for the purpose of causing, or the purpose of assisting in causing, the death of the individual, such as by assisted suicide, euthanasia, or mercy killing [or] to apply to or to affect any requirement with respect to a portion of an advance directive that directs the purposeful causing of, or the purposeful assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing."

### III.    OCR's Discriminatory And Unlawful New Rule

44.    The Final Rule was originally proposed in a Notice of Proposed Rulemaking ("NPRM") on January 26, 2018. 83 Fed. Reg. 3880, RIN 0945-ZA03.

45.    In attempting to explain the need for the proposed rule, OCR noted that it had received 10 complaints alleging violations of federal religious refusal laws between 2008 and November 2016, and an additional 34 similar complaints between November 2016 and January 2018.  By comparison, however, during a similar time period from fall 2016 to fall 2017, OCR received *more than 30,000 complaints* alleging either civil rights or HIPAA violations.  These numbers demonstrate that rulemaking to enhance enforcement authority over religious refusal laws is, in fact, manifestly *unwarranted* and a misappropriation of OCR's resources.

46.    In response to the proposed rule, Defendants received more than 70,000 comments.  A wide range of commenters—including the American Medical Association, the California Medical Association, the National Health Law Program, the Leadership Conference on Civil and Human

Rights, the American Nurses Association, and the American Academy of Nursing—all urged OCR to rescind or significantly alter the proposed rule.  SFDPH also submitted a comment expressing significant concerns about the rule and urging HHS to withdraw it from consideration.

47.     On May 2, 2019, Defendants took final agency action when they submitted the Final Rule for publication in the Federal Register.

**A.     Substantive Scope Of The New Rule**

48.     Ostensibly, the Final Rule simply implements the underlying federal statutes discussed in Part II, above.  Upon closer inspection, however, it becomes apparent that the Final Rule vastly expands the statutes' scope—far beyond their plain language and Congress's intent.  It expands the range of health care institutions and individuals who may refuse to provide services, and broadens the scope of what qualifies as a refusal under the applicable law beyond the actual provision of health care services to information and counseling about health services.

49.     The Final Rule accomplishes this by adopting excessively broad definitions of certain terms used in the statutory text of the Federal Health Care Conscience Laws.

50.     For example, the Final Rule defines *"health care entity"* so broadly as to encompass any entity, program, or activity in the health care, education, research, or insurance fields, even those that do not provide treatment to patients.  *See* 45 C.F.R. 88.2.  Similarly, the definition of *"health service program"* includes any employer who provides health benefits and receives any HHS funds. *See id*.

51.     The Final Rule defines *"assist in the performance"* to include not only assistance in the performance of those actual procedures—the ordinary meaning of the phrase—but also participation in any other activity with "an articulable connection to furthering a procedure."  *Id*.  This means, for example, that simply admitting patients to a health care facility, filing their charts, transporting them from one part of the facility to another, or even scheduling the appointment or processing an insurance claim could conceivably be considered "assist[ing] in the performance" of an abortion or sterilization, as any of those activities could have an "articulable connection" to the procedure.

52.     Indeed, OCR expressly acknowledges that it "believes [such] examples are properly considered as within the scope of the protections enacted by Congress for those who choose to assist

and those who choose not to assist in the performance of an abortion." Final Rule at 74 ("Scheduling an abortion or preparing a room and the instruments for an abortion are necessary parts of the process of providing an abortion, and it is reasonable to consider performing these actions as constituting 'assistance.'").

53.     The Final Rule thus allows any entity involved in a patient's care—from a hospital board of directors to the receptionist that schedules procedures—to use their personal beliefs to determine a patient's access to care.

54.     This goes well beyond what was intended by Congress. The Church Amendments prohibit federal funding recipients from discriminating against those who refuse to perform or "assist in the performance" of sterilizations or abortions. And during debate on the legislation, Senator Church expressly stated that, "the amendment is meant to give protection to the physicians, to the nurses, to the hospitals themselves, if they are religious affiliated institutions. There is no intention here to permit a frivolous objection from someone unconnected with the procedure to be the basis for a refusal to perform what would otherwise be a legal operation." 119 Cong. Rec. S9597 (Mar. 23, 1973) (statement of Sen. Church).

55.     The Final Rule's definition of "referral or refer for" similarly goes far beyond the statutory language and Congress's intent. The Final Rule states that "referral or refer for" "includes the provision of information in oral, written, or electronic form (including names, addresses, phone numbers, email or web addresses, directions, instructions, descriptions, or other information resources), where the purpose or reasonably foreseeable outcome of provision of the information is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure." 45 C.F.R. 88.2.

56.     But the term "referral" has a far more limited meaning in the health care context—for a doctor to direct a patient to another care provider for care. *See, e.g.*, Medicare.gov, *Glossary-R*, https://www.medicare.gov/glossary/r.html (last visited Apr. 30, 2019) (defining referral as "[a] written order from your primary care doctor for you to see a specialist or get certain medical services"); Ctrs. for Medicare & Medicaid Services, *Glossary*, https://www.cms.gov/apps/glossary/default.asp?Letter=R&Language (last visited Apr. 30, 2019)

("Generally, a referral is defined as an actual document obtained from a provider in order for the beneficiary to receive additional services."); *id.* (a referral is a "written OK from your primary care doctor for you to see a specialist or get certain services").

57.    OCR brushed aside critiques that this definition was overly broad, stating that it believes "[t]he definition is a reasonable interpretation of these terms and faithfully effectuates the text and structure of Congress's protection of health care professionals and entities from being coerced or compelled to facilitate conduct . . . that may violate their legally protected rights through the forced provision of referrals."  Final Rule at 131.

58.    Meanwhile, although OCR states that it amended the definition of "discrimination" to "narrow[] the scope of possible bases of a violation under the rule" (Final Rule at 132), it still purports to provide virtually unfettered immunity for employees who refuse to perform critical health care.  *See* 45 C.F.R. 88.2.  It does not take into consideration whether the provision of such an accommodation would cause an "undue hardship" for the employer, and would compel employers to categorically conform their business practices to the particular religious practices of employees, regardless of the impact on the business, other employees, and most importantly, patients.  Indeed, discrimination is defined so broadly as to include the provision of reasonable accommodations for religious practices which are required to *avoid* discrimination under Title VII, such as changing an employee's employment, title, or other similar status so that they can be moved into a role in which they would not encounter a religious conflict with their job duties.

59.    This expansion of "discrimination" would appear to treat virtually any action— including government enforcement of a patient non-discrimination or access-to-care law—against a health care facility or individual as per se discrimination.  But "discrimination" does not mean any action, and instead requires an assessment of context and justification, with the claimant showing unequal treatment on prohibited grounds under the operative circumstances.

60.    As discussed further below (*see* Part IV, *infra*), in light of the breadth of these definitions, the various requirements and prohibitions imposed on San Francisco by the Final Rule have sweeping implications for the City's ability to continue to provide the highest quality patient care, comply with federal law, and operate as a functioning, non-discriminatory employer.

61.    For example, Section 88.3(a)(2)(vi) would prohibit San Francisco from "requir[ing] any individual to perform or assist in the performance of any part of a health service program or research activity . . . if the individual's performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions."  In light of the nearly all-encompassing definitions of "assist in the performance" and "health service program," this provision of the Final Rule would prohibit San Francisco from requiring nearly any worker whose job is even tangentially related to health care from performing their job duties if they held religious belief somehow in conflict with those duties.  It provides no consideration for whether a reasonable accommodation for such beliefs could be reasonably provided.  If an individual were to believe that transgender people should not transition, it would empower them to refuse to provide any health-related service to a transgender patient, such as medical bill processing or scheduling an x-ray for a broken leg.  If a nurse were to oppose a same-sex couple's marriage, the Final Rule would allow the nurse to refuse to let one spouse see the other in the hospital.  If an individual claims that their moral convictions do not allow them to assist LGBTQ persons, the individual could refuse to even set up a room where an LGBTQ patient would be receiving services.

62.    Section 88.3(b)(2)(i)(A) prohibits "discrimination" against an individual who "refuses to undergo training in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide referrals for such training or such abortions."  This would allow nurse trainees and resident doctors who work at SFDPH hospitals and clinics to refuse to provide information to patients about the availability of abortions within its own system.

**B.    Enforcement Mechanism Created By The New Rule**

63.    The Final Rule requires applicants for HHS funds to submit an assurance and certification of full compliance with the Final Rule as "a condition of continued receipt of Federal financial assistance or other Federal funds from the Department."  45 C.F.R. 88.4(a), (b).  Failure to submit this assurance and certification in connection with any application for funding could result not only in the loss of those specific funds, but of all HHS funds for that applicant.  45 C.F.R. 88.4(b)(8), 88.7.

64.     The Final Rule also allows anyone to file a complaint against an entity alleging noncompliance with the rule, even if the complaint-filer's rights are not alleged to have been violated. 45 C.F.R. 88.7(b).  OCR is vested with the authority to investigate such complaints—and to initiate investigations on its own initiative, even in the absence of any complaint.  45 C.F.R. 88.7(c), (d).

65.     In the course of an investigation, either related to a complaint or not, if a party fails to respond to a request for information or data from OCR within 45 days, that in itself shall constitute a violation of the Final Rule.  45 C.F.R. 88.7(e).

66.     Moreover, the Final Rule purports to require San Francisco to waive all rights of privacy and confidentiality of doctors and patients should OCR decide to investigate.  45 C.F.R 88.6(c), 88.3(b)(1)(ii).

67.     And if OCR concludes that there is a failure to comply with the Final Rule, the consequences are harsh.  HHS may, among other sanctions, terminate all funds, withhold new HHS funds, and refer the matter to the Attorney General.  45 C.F.R. 88.7(i)(3).

68.     In other words, San Francisco will have to submit documentation to HHS certifying that it is in full compliance with the Final Rule, or risk losing *all* of its HHS funding.  Similarly, even if not one single individual complains or alleges that their rights have been violated by SFDPH, OCR can initiate an investigation, and terminate *all* of San Francisco's HHS funds based on its determination of a failure to comply with the Final Rule.

**IV.   San Francisco Faces Immediate Injury From The Final Rule**

69.     While San Francisco complies with the laws passed by Congress, the Final Rule would result in immediate injury to San Francisco.  San Francisco has two options: comply with the Final Rule in full or risk losing all HHS funds.  Neither option is an actual option for San Francisco as both would cripple the ability of SFDPH to continue to operate as San Francisco's safety-net healthcare provider for all its residents.

**A.     Complying With The Final Rule Would Be Operationally Devastating And Put Patients' Health At Risk**

70.     San Francisco recognizes and respects that an individual's religious beliefs, cultural values, and ethics may make that person reluctant to participate in an aspect of patient care.  But while

the City supports the legitimate conscience rights of individual health care professionals, the exercise

of these rights must be balanced against the fundamental obligations of the medical profession and the

right of patients to receive quality patient care.

71.     San Francisco has carefully considered these competing values and has established

policies and procedures that strike a thoughtful and appropriate balance between personnel's religious

beliefs and SFDPH's mission—indeed, obligation—to provide high quality inclusive care to all

patients.

72.     For example, the City's Memorandums of Understanding with its nurses and

supervising nurses contain conscientious objection clauses, which state:

> The rights of patients to receive quality nursing care are to be respected.
>
> It is recognized that Registered Nurses hold certain moral, ethical and religious beliefs and in good conscience may be compelled to refuse involvement with abortions and other procedures involving ethical causes.
>
> Situations will arise where the immediate nature of the patient's needs will not allow for personnel substitutions. In such circumstances the patient's right to receive the necessary nursing care will take precedence over exercise of the nurse's individual beliefs and rights until other personnel can be provided.

73.     Similarly, ZSFG Administrative Policy 5.15 ("Policy") "establish[es] guidelines for

processing [a] staff member's requests not to participate in patient care in a manner which ensures

continuity of quality patient care."  It states:

> In the event that a staff member feels reluctant to participate in an aspect of patient care because the patient's condition, treatment plan, or physician's orders are in conflict with the staff member's religious beliefs, cultural values or ethics, the staff member's written request for accommodation will be considered if the request does not negatively affect the quality of patient's care.
>
> In situations where the immediate nature of the patient's needs do not allow for the substitution of personnel, the patient's right to receive the necessary quality patient care will take precedence over the staff member's individual beliefs and rights until other competent personnel can be provided.

74.     The Policy explains that "[a]n accommodation may include personnel substitutions

through a change in patient assignment or transfer of the staff member to a different patient care area

in accordance with organizational standards."

75.     It is also clear in the Policy that the individual's "manager and/or supervisor must

determine if the staff member's request for accommodation negatively affects the quality of the

patient's care," and "[i]f the patient's needs do not allow for the substitution of personnel, the manager and/or supervisor must inform the staff member to stay at their post until other competent personnel can be provided."

76.     Pursuant to these provisions and policies, San Francisco medical personnel including nurses may be required to participate in medical procedures despite a moral, religious, or ethical objection if a patient's needs require it and a staffing change cannot be made.

77.     If possible, however, accommodations will be made, which may include transferring individuals to another area where they will not be called on to perform the task they find objectionable.

78.     These policies reflect SFDPH's respect for the religious and moral beliefs of its staff, as well as its paramount responsibility and commitment to serve the needs of its patients.  They represent a careful balancing of the important interests at issue in this area.  But these policies put San Francisco in violation of the Final Rule.

79.     Requiring personnel to participate in a procedure as necessary to protect a patient's health unless and until other competent personnel can be assigned is contrary to the categorical right to refuse to provide essential services enshrined in the Final Rule.  Transferring staff members to a different department to accommodate their request not to perform responsibilities of their current position could run afoul of the broadly defined prohibition on "discrimination" based on religious objection.

80.     But strict adherence to the requirements of the Final Rule would be operationally devastating and put patient care at risk.

81.     If nurses refuse to assist with a critical procedure when no alternate staff is available, patients could die.  This is neither hyperbole nor hypothetical.  At a hospital in New Jersey, a pregnant patient was diagnosed with placenta previa that was deemed life-threatening by the attending Labor and Delivery physician.  The doctor ordered an emergency cesarean-section delivery.  Because the procedure would terminate the pregnancy, the Labor and Delivery nurse refused to participate. Although another nurse eventually took her place, the emergency life-saving procedure was delayed

by thirty minutes, putting the patient's health at significant risk.  *See Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 222-23 (3d Cir. 2000).

82.    If SFDPH cannot involuntarily transfer receptionists or schedulers who refuse to schedule patients for medically necessary services, San Francisco's hospitals and clinics will not be able to function efficiently, significantly compromising patient care for everyone.

83.    If providers refuse to give patients information to help them obtain time-sensitive healthcare services like emergency contraception or abortion (45 C.F.R. 88.2), those patients will lose time crucial to the decision whether to terminate a pregnancy.  Under these circumstances, a woman may lose the option to choose a particular procedure, or to terminate the pregnancy at all.

84.    And if health care systems prioritize providers' religious beliefs over patients' care, vulnerable communities will not access critical medical care.  A recent study from the Center for American Progress showed that "LGBTQ people experience discrimination in health care settings; that discrimination discourages them from seeking care; and that LGBTQ people may have trouble finding alternative services if they are turned away."[3]  Indeed, 8% of LGBTQ respondents reported that they had delayed or foregone medical care because of concerns of discrimination in healthcare settings.[4] And a recent study by the National Center for Transgender Equality revealed that nearly one-quarter (23%) of transgender respondents did not seek the health care they needed—including routine and non-transition related care—in the year prior to completing the survey due to fear of being mistreated as a transgender person.[5]  Rather than addressing this pressing concern, the Final Rule provides *greater* opportunity for LGBTQ people to be denied necessary access to health care, which not only imposes immediate life-threatening consequences, but future deadly consequences for those who fear being denied the care they need.

---

[3] Shabab Ahmed Mirza & Caitlin Rooney, *Discrimination Prevents LGBTQ People from Accessing Health Care*, Center for American Progress (Jan. 18, 2018), https://www.americanprogress.org/issues/lgbt/news/2018/01/18/445130/discrimination-prevents-lgbtq-people-accessing-health-care/.

[4] *Id.*

[5] Sandy E. James et al., *Executive Summary of the Report of the 2015 U.S. Transgender Survey*, National Center for Transgender Equality at 8 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf

85.     For all these reasons, San Francisco cannot and will not commit to full compliance with the Final Rule.

**B.     Losing HHS Funds Would Devastate San Francisco's Health Care System**

86.     As described above (*see* Part III(B), *supra*), San Francisco will be required to provide an assurance and certification that it will comply with the Final Rule "as a condition of the approval, renewal, or extension of any Federal financial assistance or Federal funds from the Department." 45 CFR 88.4(a)(1).  If it fails to do so, OCR may "[t]erminate Federal financial assistance or other Federal funds from [HHS], in whole or in part."  45 CFR 88.7(i)(3)(iv).

87.     Termination or withdrawal of these funds from San Francisco would be devastating.

88.     In Fiscal Year 2018 alone, San Francisco expended over $61 million in HHS grant funds.  This money was used to fund a wide array of critical health care services and public health research.

89.     For example, the SFDPH Population Health Division receives approximately $2.5 million in federal funding for public health research including randomized clinical trials focused on HIV and substance use.

90.     The Division's HIV research unit, Bridge HIV, has been at the vanguard of HIV prevention science since the beginning of the HIV epidemic and is a recognized global leader in HIV prevention research.  It is 100% grant funded, primarily through the HHS National Institutes of Health ("NIH").  Bridge HIV's work touches HIV prevention efforts at the highest levels; national health entities, such as the Centers for  Disease Control and Prevention ("CDC") draw upon the data that comes from its trials to create guidelines to stop the spread of HIV.  Bridge HIV provides evidence that directly informs public health practice decisions.  For example, Bridge HIV participated in the landmark trial that demonstrated the safety and efficacy of using antiretroviral medicine for HIV prevention in healthy people who are at risk of HIV infections.  This prevention strategy is known as pre-exposure prophylaxis (PrEP).  PrEP has changed the landscape of HIV prevention.  In fact, the Getting to Zero San Francisco Consortium has adopted PrEP as one of the key strategies to achieve its immediate goal of reducing both HIV infections and HIV deaths by 90% from their 2013 levels by the year 2020.

91.     None of this would have been possible without funding from HHS—and future life-saving breakthroughs will be jeopardized if these funds are terminated.

92.     Similarly, SFDPH's Disease Prevention and Control Branch ("DPC") oversees public health clinical, laboratory and disease intervention services.  It performs many of the legally mandated activities intended to protect public health and therefore serves everyone in San Francisco.  This Branch is also responsible for informing and guiding San Francisco clinicians in best practices for communicable and chronic disease prevention and is a resource for expert clinical and laboratory consultation, including control and treatment of communicable diseases during outbreaks.  Within SFDPH, DPC staff work closely with the San Francisco Health Network to optimize clinical policies and care in the DPC core areas.  In addition, DPC staff work with clinical providers and systems throughout San Francisco to improve prevention, diagnosis, and treatment of communicable diseases using a public health detailing model of engagement.

93.     DPC currently receives over $15 million in funding from the CDC.  Losing these funds would impact all aspects of the Branch's work and threaten San Francisco's ability to detect, treat, and prevent diseases such as HIV, STDs, TB, Hepatitis C and other communicable diseases—putting hundreds of thousands of people at higher risk for illness.

94.     As another example, SFDPH uses HHS Title X grant money to fund family-planning projects for 6,623 patients at 10 sites/clinics.  Approximately 40% of the patients served by SFDPH's Title X-funded clinics are Latinx, approximately 35% are Asian or Pacific Islander, approximately 20% are African-American, and the remainder are white or Middle Eastern.  Almost 100% of SFDPH's Title X patients are at 250% of the federal poverty level ("FPL") or below.  Only 1% of SFDPH's Title X patients have private health insurance, while 47% are on Medi-Cal (California's Medicaid program), and the remainder are either uninsured or enrolled in California's Family Planning, Access, Care, and Treatment ("Family PACT") program.

95.     Among other things, SFDPH uses Title X funding to develop training programs that have greatly improved the quality and effectiveness of care offered at SFDPH's Title X clinics.  Using Title X funds, SFDPH trains approximately 20–30 clinical staff members every year with respect to key aspects of their services, including contraceptive counseling and prescriptions, STI testing and

treatment, harm reduction approaches, and pregnancy testing and counseling. SFDPH also provides smaller training to specific clinics upon request. Without Title X funding, SFDPH's ability to provide these trainings will be greatly inhibited.

96.    SFDPH also uses Title X funds to develop protocols for registered nurses ("RNs") to dispense oral emergency contraceptives. One such protocol that is currently pending will enable registered nurses to dispense pills, patches, and contraceptive rings. These protocols will significantly expand patient access to important contraceptive methods.

97.    SFDPH uses Title X funds to educate the public on important topics relating to family planning and reproductive health. For example, SFDPH uses Title X funds to support its "Go Folic" project to increase community awareness of the importance of folic acid supplementation, which prevents birth defects. SFDPH uses Title X funds to support a public education campaign to combat chlamydia, whose rates have increased in San Francisco and across California. And with Title X funds, SFDPH has partnered with the San Francisco Unified School District, Planned Parenthood, and other youth-serving health agencies to make San Francisco a leader in developing evidence-based sex education curricula and outreach. Indeed, thanks to those public education and outreach efforts, we now frequently see adolescents visiting Title X clinics seeking birth control before they become sexually active—a major public-health accomplishment.

98.    Without HHS funds, SFDPH will have to substantially curtail all of the projects discussed above.[6]

99.    These are just some of the myriad ways that termination of HHS grant funding will impact SFDPH, leading to a lower quality of care and significantly worse health outcomes for patients, and for the public as a whole.

100.    But it is not just grant funds that are at risk under the Final Rule. To the contrary, in the absence of San Francisco's full compliance with the Final Rule, the City stands to lose *all* "Federal

---

[6] Notably, the U.S. District Court for the Northern District of California recently granted a preliminary injunction against new HHS regulations concerning the implementation of Title X based, in part, on the Court's conclusion that the loss of Title X funds in jurisdictions across California would significantly impact the availability of important medical services. California v. Azar, No. 19-CV-01184-EMC, 2019 WL 1877392, at *8-10 (N.D. Cal. Apr. 26, 2019).

financial assistance or other Federal funds from the Department" (45 C.F.R. 88.7(i)(3)(iv)), including funds San Francisco receives for entitlement programs for its residents including Medicaid and Medicare, Temporary Assistance for Needy Families ("TANF"), Foster Care, and Child Support Services.

101.    In the Fiscal Year ending June 2017, San Francisco expended over $58 million in TANF funds, nearly $35 million in Foster Care—Title IV-E funds, $10 million in adoption assistance funds, $8 million is child support enforcement funds, $642 million in Medicaid, and $128 million in Medicare funds—all of which are administered by HHS.

102.    Taking all of HHS grants and HHS administered entitlements into account, San Francisco stands to lose close to $1 billion in funding.

103.    These HHS funds make up approximately a third of SFDPH's total budget, approximately 40% of Zuckerberg San Francisco General's budget, and well over half the budget for Laguna Honda Hospital.

104.    If HHS terminated these funds, the result would be catastrophic.  SFDPH would have to restructure the entire public health system with a drastic reduction in services.  Hospital beds, behavioral health clinics, primary care clinics, and emergency services would all have to be significantly reduced.  Hundreds of employees would likely lose their jobs.  People in need of urgent and emergent health care may not be able to receive timely services.  In short, termination of all HHS funds would cause a loss of critical health care capacity for San Francisco and the region.

105.    In short, San Francisco faces an impossible—and unlawful—choice: forgo critical funds or agree to unlawful rules that prioritize providers' religious beliefs over patients' care.  Either way, SFDPH's ability to continue providing critical high-quality safety-net healthcare to all of its residents will be impacted and patient care will be compromised.

## COUNT ONE

### Violation of APA (5 U.S.C. § 706(2)(C))—Exceeds Statutory Authority

106.    Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

107.    The APA requires courts to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

108.    The Final Rule violates Section 706(2)(C) because the underlying laws do not delegate authority to Defendants to promulgate legislative regulations with the force of law.

109.    In addition, the Final Rule exceeds Defendants' authority under the enabling statutes because it impermissibly adopts excessively broad definitions of statutory text, including but not limited to the terms: "assist in the performance," "health care entity," "referral," "refer for," and "discrimination."

110.    The Final Rule also exceeds Defendants' authority under the enabling statutes because nothing within the statutes cited by Defendants gives HHS the authority to (a) require healthcare entities to provide assurances or certifications, (b) post the extensive notice included as Appendix A of the Final Rule, (c) keep and make records available for review, and (d) conduct periodic compliance reviews or to subject healthcare entities to the full investigative process described in Section 88.7 of the Final Rule.

111.    For all of these reasons, Defendants acted in excess of their statutory authority by promulgating the Final Rule, rendering it invalid.

## COUNT TWO

### Violation of APA (5 U.S.C. § 706(2)(A))—Contrary To Law

112.    Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

113.    The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

114.    The Final Rule violates Section 706(2)(A) because it conflicts with at least three federal laws.

115.    First, the Final Rule conflicts with Section 1554 of the Affordable Care Act, which forbids the HHS Secretary from promulgating "any regulation" that:

(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; [or] (5) violates the principles of informed consent and the ethical standards of health care professionals.

42 U.S.C. § 18114.

116.     Second, the Final Rule conflicts with the Emergency Medical Treatment and Labor Act ("EMTALA"), which requires hospitals to provide emergency care.  42 U.S.C. § 1395dd.  The Final Rule contains no protections to ensure that patients have adequate access to necessary health care in emergencies, placing it in direct conflict with EMTALA.

117.     Third, the Final Rule conflicts with Title VII of the Civil Rights Act of 1964.  Title VII prohibits discrimination in employment on the basis of religious or ethical beliefs, but also states that employers are not obligated to accommodate an employee's religious belief if doing so would cause an "undue hardship."   The Final Rule ignores the "undue hardship" test in favor of a blanket rule against "discrimination."

118.     For all of these reasons, the Final Rule is "not in accordance with" federal law, and is therefore invalid.

## COUNT THREE

### Violation of APA (5 U.S.C. § 706(2)(A))—Arbitrary and Capricious

119.     Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

120.     The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).  Agency action should be overturned when, among other things, the agency: (i) relied on factors Congress did not intend for it to consider; (ii) failed to consider important aspects of the problem it is addressing, including issues raised in multiple comments submitted on the proposed rule; or (iii) explained its decision counter to the evidence before it.  *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983).

121.     In issuing the Final Rule, Defendants ignored important aspects of the problem, including impacts of the Final Rule on vulnerable populations that were raised by San Francisco and

others in public comments.  Moreover, Defendants reversed course on current policy without offering an adequate explanation.  Indeed, Defendants have offered an explanation for their decision that "runs counter to the evidence before the agency" and is "so implausible that it could not be ascribed to a difference of view or the product of agency expertise." *Id.*

122.    Accordingly, Defendants' actions were arbitrary and capricious and the Final Rule is invalid.

## COUNT FOUR

### Violation of the Establishment Clause

123.    Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

124.    Laws that compel employers to categorically "conform their business practices to the particular religious practices of . . . employees"—regardless of the impact on the business, other employees and patients/customers—violate the Establishment Clause.  *Estate of Thorton v. Caldor*, 472 U.S. 703, 709 (1995).

125.    The Final Rule does not include any provision for balancing or accounting for a patient's right to care or an employer's commitment to deliver that care against an employee's religious objection to providing health care services.

126.    Accordingly, the Final Rule is unconstitutional under the Establishment Clause of the First Amendment of the Constitution.

## COUNT FIVE

### Violation of Separation of Powers

127.    Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

128.    The Constitution vests Congress with legislative powers, *see* U.S. Const. art. 1, § 1, and the spending power, *see* U.S. Const. art. 1, § 8, cl. 1.  Absent a statutory provision or an express delegation, only Congress is entitled to attach conditions to federal funds.  The Executive Branch cannot "amend[] parts of duly enacted statutes" to impose additional conditions on such funds. *Clinton v. City of New York*, 524 U.S. 417, 439 (1998).

129. By adopting excessively broad definitions of statutory text and conditioning receipt of federal funds on compliance with the resulting conditions, Defendants unconstitutionally intrude upon and usurp powers that have been assigned to Congress, violating principles of separation of powers.

## COUNT SIX

### Violation of Spending Clause

130. Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

131. The Final Rule also violates the Spending Clause of the Constitution because it:

      a. coerces state and local governments to adhere to the Final Rule or lose millions of dollars in federal funds (*see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012));

      b. is vague and ambiguous and does not provide adequate notice of what specific action or conduct, if engaged in, will result in the withholding of federal funds (*see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981));

      c. constitutes unlawful post-acceptance conditions on federal funds (*see id.*); and

      d. is not rationally related to the federal interest in the program that receives the federal funds (*see South Dakota v. Dole*, 483 U.S. 203, 207 (1987)).

132. For all of these reasons, the Final Rule is unconstitutional under the Spending Clause.

## COUNT SEVEN

### Violation of Due Process

133. Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

134. To satisfy due process, a law must (1) "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," and (2) "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

135. The Final Rule's enforcement provisions do not meet either of these requirements.

## PRAYER FOR RELIEF

Wherefore, San Francisco prays that the Court grant the following relief:

1. Declare the Final Rule as published in the Federal Register unconstitutional;

2.  Postpone the effective date of the Final Rule as published in the Federal Register, pending judicial review, pursuant to 5 U.S.C. § 705;

3.  Hold unlawful and set aside the Final Rule as published in the Federal Register, pursuant to 5 U.S.C. § 706(2);

4.  Issue a preliminary injunction against implementation and enforcement of the Final Rule as published in the Federal Register;

5.  Issue a permanent injunction against implementation and enforcement of the Final Rule as published in the Federal Register;

6.  Award San Francisco reasonable costs and attorneys' fees; and

7.  Grant any other further relief that the Court deems fit and proper.


Dated:   May 2, 2019

DENNIS J. HERRERA
City Attorney
JESSE C. SMITH
RONALD P. FLYNN
YVONNE R. MERÉ
SARA J. EISENBERG
JAIME M. HULING DELAYE

Deputy City Attorneys


By: */s/ Dennis J. Herrera*
DENNIS J. HERRERA
City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO