DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
SARA J. EISENBERG, State Bar #269303
Chief of Strategic Advocacy
JAIME M. HULING DELAYE, State Bar #270784
Deputy City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:      (415) 554-4633
Facsimile:      (415) 554-4715
E-Mail:         sara.eisenberg@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>            Plaintiff,<br><br>      vs.<br><br>ALEX M. AZAR II, Secretary of U.S. Department of Health and Human Services; ROGER SEVERINO, Director, Office for Civil Rights, Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and DOES 1-25,<br><br>            Defendants. | Case No. 3:19-cv-2405-JCS<br><br>**CITY AND COUNTY OF SAN FRANCISCO'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date:      July 12, 2019<br>Time:              10:30 a.m.<br>Judge:             Hon. Joseph C. Spero<br>Place:             Courtroom G, 15th Floor<br><br>Trial Date:        Not set |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ......................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

INTRODUCTION ........................................................................................... 1

FACTUAL AND LEGAL BACKGROUND ............................................................ 2

      A.    San Francisco Manages A Comprehensive Health Care System ................. 2

      B.    The Substantive Basis And Scope Of The Final Rule. ............................... 4

PRELIMINARY RELIEF REQUESTED ................................................................ 6

PRELIMINARY INJUNCTION STANDARD .......................................................... 6

ARGUMENT ................................................................................................. 6

    I.    San Francisco Is Likely To Succeed On The Merits Of Its Claims. ..................... 6

      A.    The Final Rule Violates The APA. ..................................................... 6

          1.    The Challenged Provisions Exceed HHS's Statutory Authority. .... 6

              a.    HHS Does Not Possess Legislative Rulemaking Powers Under The Abortion Refusal Statutes. ................................. 7

              b.    HHS Exceeded Its Authority By Adopting Excessively Broad Definitions Of Statutory Text. ................................. 8

          2.    The Challenged Provisions Are Contrary To Law. ....................... 12

          3.    The Final Rule Is Arbitrary And Capricious. ............................... 13

              a.    The Claimed Benefits Are Speculative And Unsupported. 14

              b.    HHS Did Not Adequately Consider Harm To Patients. .... 15

      B.    The Final Rule Violates The Constitution. ........................................... 17

          1.    The Challenged Provisions Violate Separation Of Powers. .......... 17

          2.    The Challenged Enforcement Provisions Violate The Spending Clause. ....................................................................... 17

              a.    The Consequence Of Losing All HHS Funds Is Coercive. 18

               b.    Much Of The Threatened Funding Is Unrelated To The Final Rule. ....................................................................... 19

          3.    The Definition Of "Discrimination" Violates The Establishment Clause. ....................................................................... 19

    II.    San Francisco Will Suffer Irreparable Harm In The Absence Of Preliminary Relief. ....................................................................................... 21

    III.    The Balance Of Equities And Public Interest Favor A Preliminary Injunction. ... 24

    IV.    Nationwide Relief Is Appropriate In The Circumstances Presented Here. .......... 25

CONCLUSION..................................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Federal Cases**

*Alliance for the Wild Rockies ,Cottrell*
   632 F.3d 1127 (9th Cir. 2011) .................................................................................6

*Am. Library Ass'n v. F.C.C.*
   406 F.3d 689 (D.C. Cir. 2005) ...............................................................................8

*Am. Petroleum Inst. v. U.S. E.P.A.*
   52 F.3d 1113 (D.C. Cir. 1995) ...............................................................................7

*Ariz. Dream Act Coal. v. Brewer*
   757 F.3d 1053 (9th Cir. 2014) ..............................................................................24

*Atl. City Elec. Co. v. F.E.R.C.*
   295 F.3d 1 (D.C. Cir. 2002) ...................................................................................7

*Bowen v. Georgetown Univ. Hosp.*
   488 U.S. 204 (1988) ...............................................................................................7

*Cal. Indep. Sys. Operator Corp. v. F.E.R.C.*
   372 F.3d 395 (D.C. Cir. 2004) ...........................................................................7, 8

*Califano v. Yamasaki*
   442 U.S. 682 (1979) .............................................................................................25

*California v. Azar*
   2019 WL 1877392 (N.D. Cal. Apr. 26, 2019) ...............................................14, 17

*California v. Azar*
   911 F.3d 558 (9th Cir. 2018) ..............................................................................1, 6

*Chemical Mfrs. Ass'n v. E.P.A.*
   919 F.2d 158 (D.C. Cir. 1990) ...............................................................................9

*City of Arlington, Tex. v. F.C.C.*
   569 U.S. 290 (2013) ...............................................................................................8

*Clinton v. City of New York*
   524 U.S. 417 (1998) .............................................................................................17

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*
   538 F.3d 1172 (9th Cir. 2008) ..............................................................................17

*Cutter v. Wilkinson*
   544 U.S. 709 (2005) .............................................................................................20

*Drakes Bay Oyster Co. v. Jewell*
   747 F.3d 1073 (9th Cir. 2014) ..............................................................................24

*Estate of Thornton v. Caldor, Inc.*
  472 U.S. 703 (1985)................................................................19, 20, 21

*Gonzales v. Oregon*
  546 U.S. 243 (2006)................................................................7

*In re Aiken Cty.*
  725 F.3d 255 (D.C. Cir. 2013)................................................17

*Jennings v. Rodriguez*
  138 S. Ct. 830 (2018)..............................................................12

*La. Pub. Serv. Comm'n v. FCC*
  476 U.S. 355 (1986)................................................................7

*Larson v. Valente*
  456 U.S. 228 (1982)................................................................20

*Lemon v. Kurtzman*
  403 U.S. 602 (1971)................................................................20

*Massachusetts v. United States*
  435 U.S. 444 (1978)................................................................19

*Melendres v. Arpaio*
  695 F.3d 990 (9th Cir. 2012)..................................................24

*Mingo Logan Coal Co. v. Envtl. Prot. Agency*
  829 F.3d 710 (D.C. Cir. 2016)................................................14

*Motion Picture Ass'n of Am., Inc. v. F.C.C.*
  309 F.3d 796 (D.C. Cir. 2002)................................................8

*Motor Veh. Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*
  463 U.S. 29 (1983)................................................................13

*Nat'l Ass'n of Home Builders v. E.P.A.*
  682 F.3d 1032 (D.C. Cir. 2012)..........................................14, 17

*Nat'l Family Planning and Reproductive Health Assoc. v. Ashcroft*
  2004 WL 3633834 (D.D.C. Dec. 24, 2004)................................8

*Nat'l Fed'n of Indep. Bus. v. Sibelius*
  567 U.S. 519 (2012)............................................................18, 19

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*
  45 F.3d 1399 (D.C. Cir. 1998)................................................25

*New York v. United States*
  505 U.S. 144 (1992)................................................................19

*Nw. Envtl. Advocates v. U.S. EPA*
  537 F.3d 1006 (9th Cir. 2008) ........................................................................12

*Otten v. Baltimore & Ohio R. Co.*
  205 F.3d 58 (1953) ...........................................................................................21

*Pharm. Research & Mfrs. of Am. v. United States Dep't of Health & Human Servs.*
  43 F. Supp. 3d 28 (D.D.C. 2014) .......................................................................8

*Rodriguez v. Robbins*
  715 F.3d 1127 (9th Cir. 2013) .....................................................................12, 25

*South Dakota v. Dole*
  483 U.S. 203 (1987).....................................................................................17, 18

*Steele v. Bulova Watch Co.*
  344 U.S. 280 (1952) .........................................................................................25

*Taylor v. St. Vincent's Hospital*
  523 F.2d 75 (9th Cir. 1975) ...............................................................................9

*Texas v. United States*
  809 F.3d 134 (5th Cir. 2015) ...........................................................................25

*United States v. Nova Scotia Food Prod. Corp.*
  568 F.2d 240 (2d Cir. 1977) .............................................................................15

*Winter v. Nat'l Res. Def. Council, Inc.*
  555 U.S. 7 (2008) ...............................................................................................6

**Federal Statutes**

15 U.S.C. § 1392 .......................................................................................................7

29 U.S.C. § 655(b) ....................................................................................................7

42 U.S.C. § 1395dd .................................................................................................12

42 U.S.C. § 1395dd(e)(1)(A) ...................................................................................12

42 U.S.C. § 18113 .....................................................................................................9

42 U.S.C. § 2000d-1 ..................................................................................................7

42 U.S.C. § 238n .....................................................................................................11

42 U.S.C. § 238n(a) ...............................................................................................4, 5

42 U.S.C. § 238n(c)(2)...............................................................................................9

42 U.S.C. § 300a-7 ....................................................................................................4

5 U.S.C. § 706(2)(A) ................................................................................12, 13

5 U.S.C. § 706(2)(C) ..............................................................................6, 8, 9

Consolidated Appropriations Act of 2009
    Pub. L. No. 111-117, § 508(d)(1), 123 Stat. 3034 ..............................4, 5, 11

**Rules**
Federal Rule of Civil Procedure 65 ...................................................................1

**Regulations**
45 C.F. R. § 88.3(a) .........................................................................................1, 6

45 C.F. R. § 88.7 ..................................................................................................5

45 C.F. R. § 88.7(i)(3) ..................................................................................1, 6, 24

45 C.F.R. § 88.2 ...................................................1, 5, 6, 8, 9, 10, 11, 20

45 C.F.R. § 88.3(a)(2)(v) ...................................................................................19

45 C.F.R. § 88.3(b) .........................................................................................1, 6

45 C.F.R. § 88.3(c) .........................................................................................1, 6

45 C.F.R. § 88.4 ...............................................................................................1, 6

45 C.F.R. § 88.4(a) ...............................................................................................5

45 C.F.R. § 88.4(a)(1)-(2) ...................................................................................18

45 C.F.R. § 88.4(b) ...............................................................................................5

45 C.F.R. § 88.4(b)(8) ..........................................................................................5

45 C.F.R. § 88.7(i)(3)(iv)-(v) .............................................................................18

45 C.F.R. § 88.7(j) ..........................................................................................1, 6

**Constitutional Provisions**
U.S. Const. Art. I, § 8, cl. 1..............................................................................17

**Other Authorities**
119 Cong. Rec. S9595 (Mar. 27, 1973) .........................................................9, 10

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that on July 12, 2019 at 10:30 a.m. or as soon thereafter as they may be heard before the Honorable Joseph C. Spero in Courtroom G of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA  94102, Plaintiff City and County of San Francisco ("City" or "San Francisco") will and hereby does move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendants Alex M. Azar II, in his official capacity as Secretary of the U.S. Department of Health and Human Services; Roger Severino, in his official capacity as Director of the Office for Civil Rights, Department of Health and Human Services; the U.S. Department of Health and Human Services (collectively, "Defendants"); and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them.

San Francisco respectfully moves the Court to enter a nationwide preliminary injunction prohibiting Defendants from enforcing (1) certain definitions set forth in Section 88.2 ; (2) Section 88.3(a), (b), and (c); (3) Section 88.4 as applied to Section 88.3(a), (b), and (c); and (4) Section 88.7(i)(3) and (j) of the regulations entitled "Protecting Statutory Conscience Rights in Health Care; Delegations of Authority," published in the Federal Register on Tuesday, May 21st, 2019 (84 Fed. Reg. 23170 (May 21, 2019) (to be codified as 45 C.F.R. pt. 88) (the "Final Rule") (collectively, the "Challenged Provisions").  This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the supporting declarations, as well as any other evidence or argument as may be presented by the time this motion is heard by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

On July 22, 2019, the U.S. Department of Health and Human Services's ("HHS") "conscience" rule is scheduled to go into effect.  If it does, nurses at San Francisco's level one trauma center will be able to refuse to provide treatment to women experiencing life threatening pregnancy-related complications—even if no other personnel is available to step in.  Call operators will be able to refuse to direct patients and potential patients to the correct departments to access abortions and gender transition-related services.  Staff at all levels will be emboldened to discriminate against LGBTQ

patients.  According to the doctors who provide front-line care to patients through the San Francisco Department of Public Health ("SFDPH"), patient care will be severely compromised as a result. Patients in the emergency room at Zuckerberg San Francisco General Hospital will die if nurses can categorically refuse to opt out of providing care.  Declaration of Dr. Christopher Colwell ("Colwell Decl.") ¶¶ 6-10.  Women seeking abortions will be delayed or denied time-sensitive treatment, increasing the medical risks and costs with each passing day.  Declaration of Dr. Eleanor Drey ("Drey Decl.") ¶¶ 5-6.  Transgender individuals will delay seeking any medical care, and some will resort to dangerous self-medication like black market hormones or industrial grade silicone injections, which can have serious—even fatal—effects.  Declaration of Seth Pardo, Ph.D. ("Pardo Decl.") ¶ 12; Declaration of Dr. Barry Zevin ("Zevin Decl.") ¶¶ 6-7.

Despite these dire consequences, San Francisco cannot realistically refuse to comply with the Final Rule.  If the Office of Civil Rights ("OCR") in the HHS deems San Francisco to be in anything less than full compliance, OCR can terminate all of San Francisco's HHS funds—which make up approximately one-third of SFDPH's total budget, nearly 40% of Zuckerberg San Francisco General Hospital's budget, and over 60% of the budget for Laguna Honda Hospital.  Declaration of Greg Wagner ("Wagner Decl.") ¶ 4.  The effects of this loss would be nothing short of catastrophic for SFDPH and the City as a whole.

But this Court can, and should, enjoin the Final Rule from going into effect.  The Final Rule violates the Administrative Procedure Act ("APA") because it exceeds the statutory authority Congress has given HHS, is contrary to the Emergency Medical Treatment and Labor Act ("EMTALA"), and is arbitrary and capricious.  It also violates the Establishment Clause, Separation of Powers, and the Spending Clause of the Constitution.  Accordingly, and because it will cause imminent and irreparable harm to San Francisco's health care system, a preliminary injunction is warranted—and indeed critically necessary—to stop the Final Rule from going into effect.

## FACTUAL AND LEGAL BACKGROUND

### A.    San Francisco Manages A Comprehensive Health Care System.

The mission of SFDPH is to protect and promote health and well-being for all in San Francisco.  Declaration of Dr. Grant Colfax ("Colfax Decl.") ¶ 4.  SFDPH is dedicated to providing

inclusive care to *all* patients.  *Id.*  To accomplish this, SFDPH administers a complete health care system through the San Francisco Health Network ("SFHN").  *Id.* at ¶ 7.

Among the many facilities owned and operated by SFHN are two hospitals.  Colfax Decl. ¶ 8.  Zuckerberg San Francisco General Hospital ("ZSFG") is the only level one trauma center serving a region of more than 1.5 million people.  *Id.* at ¶ 10.  With the busiest emergency room in San Francisco, ZSFG receives one-third of all ambulances in the City, and treats nearly four thousand traumatic injuries, annually.  *Id.*  It provides care for approximately one in eight San Franciscans every year, regardless of their ability to pay.  *Id.*  That care includes delivering over one thousand babies a year, as well as providing first- and second-trimester abortion care.  *Id.* at ¶ 9.  Laguna Honda Hospital, meanwhile, provides a full range of skilled nursing services to adult residents of San Francisco who are disabled or chronically ill.  *Id.* at ¶ 11.

SFHN also includes fourteen clinics where patients can access health care services, including primary care, pediatric care, HIV prevention and treatment services, dental care, family planning, and prenatal care.  Colfax Decl. ¶ 12.  The Maternal, Child and Adolescent Health ("MCAH") Section of SFDPH offers a wide range of services through SFHN to San Francisco's most vulnerable children and families, including the Family Planning and Preconception Health Program ("FPPHP"), which offers reproductive life planning, reproductive health exams, birth control counseling and prescriptions, emergency contraception, and sexual health education and counseling.  Declaration of Shivaun M. Nestor ("Nestor Decl.") ¶ 9.  SFDPH also offers Gender Health SF, which provides access to transgender surgeries and related education and preparation services for eligible adult residents.  Colfax Decl. ¶ 5.  SFHN provides a range of health services to transgender residents ranging from preventative and primary care to hormone therapy and specialty care.  *Id.*

Separately, SFDPH's Population Health Division addresses public health concerns including health promotion, disease prevention, and the monitoring of threats to the public's health.  Colfax Decl. ¶ 18.  Some of its branches include: Bridge HIV, a global leader in HIV prevention, research, and education; Disease Prevention and Control, responsible for core public health communicable disease functions; and Emergency Medical Services Agency, which manages and prepares for all types of medical emergencies in San Francisco.  *Id.*

To provide these programs, San Francisco relies on HHS funds.  In the last complete fiscal year of 2017-2018, the City expended over $1 billion in HHS funds, representing approximately 10% of San Francisco's total operating budget.  Declaration of Ben Rosenfield ("Rosenfield Decl.") ¶¶ 4, 8.

San Francisco's existing policies respect personnel's religious beliefs without compromising SFDPH's obligation to provide high quality inclusive care to all patients.  For example, under ZSFG's Administrative Policy 5.15, the hospital will honor a staff member's request not to participate in an aspect of patient care because doing so would conflict with the person's religious or moral beliefs, as long as it does not negatively affect the quality of patient care.  But importantly, if the immediate nature of the patient's needs do not allow for a substitution of personnel, the patient's right to receive the necessary quality care takes precedence over the staff member's individual beliefs and rights until other competent personnel can be provided.  Declaration of Alice Chen ("Chen Decl.") ¶¶ 6-11 & Ex. A.  If individuals could categorically refuse to assist with a critical procedure without repercussion, patients would suffer.  Colwell Decl. ¶ 6; Chen Decl. ¶ 12.

**B.      The Substantive Basis And Scope Of The Final Rule.**

Ostensibly, the Final Rule simply implements certain federal statutes concerning refusals to provide healthcare services due to religious objections, including the Church Amendments (42 U.S.C. § 300a-7), the Weldon Amendment (*See, e.g.*, Consolidated Appropriations Act of 2009, Pub. L. No. 111-117, § 508(d)(1), 123 Stat. 3034), and the Coats-Snowe Amendment (42 U.S.C. § 238n(a)) (collectively, the "Abortion Refusal Statutes").

The Church Amendments prohibit government entities from using certain federal funds to require that individuals "perform or assist in the performance" of any sterilization procedure or abortion if doing so would be contrary to religious beliefs or moral convictions.  42 U.S.C. § 300a-7. Likewise, receipt of the federal funds by religious entities cannot be conditioned on them making their facilities or personnel available for sterilization procedures or abortions the entity opposes.  And entities that receive federal funds cannot "discriminate" against a provider who performed or assisted in the performance of such procedures, or refused to do so, on religious grounds.  *Id.*

The Weldon Amendment is an appropriations rider included in the Labor, Health and Human Services, Education, and Related Agencies Appropriations Act every year since 2004.  It prevents the

appropriated funds from being given to government entities that discriminate against any "institutional or individual health care entity" because the entity "does not provide, pay for, provide coverage of, or refer for abortions."  *See, e.g.*, Consolidated Appropriations Act of 2009, Pub. L. No. 111-117, § 508(d)(1), 123 Stat. 3034.

The Coats-Snowe Amendment prohibits government entities that receive federal financial assistance from discriminating against a "health care entity," narrowly defined as physicians and health profession trainees, that refuse to undergo training to perform abortions, provide referrals for abortions or abortion training, or make arrangements for those activities.  42 U.S.C. § 238n(a).

The Final Rule vastly expands religious refusals beyond just the procedures performed by medical personnel contemplated in these laws.  It does so by adopting excessively broad definitions of certain terms used in those statutory texts.  "*Health care entity*" is defined so broadly as to encompass any entity, program, or activity in the health care, education, research, or insurance fields, even those that do not provide treatment to patients.  *See* 45 C.F.R. § 88.2.  "*Assist in the performance*" includes not only assistance in the performance of procedures, but extends to participation in any other activity "with an articulable connection to furthering a procedure" such as scheduling, transporting a patient, or processing an insurance claim.  *Id.*  "*Referral*" includes "the provision of information" in any form "where the purpose or reasonably foreseeable outcome of provision of the information is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure."  *Id.*  Finally, the definition of "*discrimination*" only allows the City to "effective[ly] accommodat[e]" a worker's religious beliefs, and only if the worker *voluntarily* accepts the accommodation.  *Id.*

The enforcement mechanism created by the Final Rule is draconian and unlawfully coercive.  Applicants for HHS funds are required to submit an assurance and certification of full compliance with the Final Rule as "a condition of continued receipt of Federal financial assistance or Federal funds from the Department."  45 C.F.R. § 88.4(a), (b).  The sanction for failure to submit this assurance and certification or to comply in full with any aspect of the Final Rule includes loss of all HHS funds.  *Id.* §§ 88.4(b)(8), 88.7.  For the Court's convenience, a copy of the Final Rule is attached as Exhibit A to San Francisco's Request for Judicial Notice ("RJN").

**PRELIMINARY RELIEF REQUESTED**

Although the City's complaint challenges the entirety of the Final Rule, San Francisco seeks more narrow preliminary relief tailored to those provisions that will cause imminent and irreparable harm to the City if allowed to go into effect.  The City moves to preliminarily enjoin enforcement of: (1) the definitions of "health care entity," "assist in the performance," "referral," and "discrimination" set forth in Section 88.2 of the Final Rule, ("Challenged Definitions"); (2) Section 88.3(a), (b), and (c), which purport to implement the Abortion Refusal Statutes ("Challenged Substantive Requirements"); (3) the certification and assurances requirements set forth in Section 88.4, as applied to the Challenged Substantive Requirements; and (4) Section 88.7(i)(3) and (j) ("Enforcement Provisions"), which would allow OCR to deny all current and future HHS funding to San Francisco if it fails to provide the "Certifications and Assurances," or violates the Final Rule in any way.

**PRELIMINARY INJUNCTION STANDARD**

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat'l Res. Def. Council, Inc.¸* 555 U.S. 7, 20 (2008).  When the government is a party, "the last two factors merge." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).  As long as each of the factors is met, they can be evaluated on a sliding scale, such that a lighter showing of "serious questions going to the merits" is sufficient to support issuance of a preliminary injunction where the balance of hardships "tips sharply" in its favor.  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-36 (9th Cir. 2011).

**ARGUMENT**

**I.      San Francisco Is Likely To Succeed On The Merits Of Its Claims.**

**A.      The Final Rule Violates The APA.**

**1.      The Challenged Provisions Exceed HHS's Statutory Authority.**

The APA requires courts to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).  The Challenged Provisions should be declared unlawful under this standard for two independent reasons.

### a. HHS Does Not Possess Legislative Rulemaking Powers Under The Abortion Refusal Statutes.

HHS's power to promulgate legislative regulations "is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988); *see also Gonzales v. Oregon*, 546 U.S. 243, 274–75 (2006). As creatures of statute, federal agencies "literally ha[ve] no power to act . . . unless and until Congress confers power upon" them. *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374 (1986). If no statute vests an agency with authority to promulgate a particular rule, the agency's action is "plainly contrary to law and cannot stand." *Atl. City Elec. Co. v. F.E.R.C.*, 295 F.3d 1, 8 (D.C. Cir. 2002) (internal quotation marks omitted).

Moreover, because federal agencies have no free-standing legislative authority, it is "incumbent upon [the agency] to demonstrate that some statute confers upon it the power it purport[s] to exercise." *Cal. Indep. Sys. Operator Corp. v. F.E.R.C.,* 372 F.3d 395, 398 (D.C. Cir. 2004). The agency must affirmatively demonstrate this by pointing to specific statutory authority. *Am. Petroleum Inst. v. U.S. E.P.A.,* 52 F.3d 1113, 1120 (D.C. Cir. 1995) (courts "will not presume a delegation of power based solely on the fact that there is not an express withholding of such power").

There are many examples of such specific grants of rulemaking authority. To name just a few, Congress authorized the Occupational Safety and Health Administration to issue occupational safety and health standards. 29 U.S.C. § 655(b). It directed the National Highway Traffic Safety Administration to issue motor vehicle safety standards. 15 U.S.C. § 1392. And it directed all relevant federal agencies to issue "rules, regulations, or orders of general applicability" to achieve the objectives of Title VI. 42 U.S.C. § 2000d-1. By contrast, the Church, Coats-Snowe, and Weldon Amendments do not include *any* delegation of regulatory authority to HHS. HHS does not claim otherwise. In the Final Rule, HHS identifies *other* federal conscience laws that authorize HHS to promulgate rules implementing *those* laws (*see* 84 Fed. Reg. at 23184 (citing Section 1321(a) of the Affordable Care Act and Section 1102 of the Social Security Act))—but HHS is silent as to the statutes at issue here. *Id.*[1] And HHS has not identified any other source of authority for promulgating legislative regulations implementing these laws. *See* 84 Fed. Reg. at 23183-23186. Nor could it.

---

[1] Notably, HHS itself previously agreed that "it is not clear that the Weldon Amendment can be said to delegate regulatory authority to the Executive Branch at all." Defs.' Brief, *Nat'l Family*

In such circumstances, courts have not hesitated to "hold unlawful and set aside" agency regulations pursuant to Section 706(2)(C) of the APA.  *See, e.g.*, *Air Alliance Houston v. E.P.A.*, 906 F.3d 1049, 1060-66 (D.C. Cir. 2018) (vacating E.P.A.'s rule delaying the effective date of the Chemical Disaster Rule due to lack of statutory authority); *Motion Picture Ass'n of Am., Inc. v. F.C.C.*, 309 F.3d 796, 807 (D.C. Cir. 2002) (vacating FCC rules mandating television programming with video descriptions because "the FCC can point to no statutory provision that gives the agency authority to mandate visual description rules"); *Am. Library Ass'n v. F.C.C.*, 406 F.3d 689, 708 (D.C. Cir. 2005) (rejecting the FCC's "bare suggestion that it possesses *plenary* authority to act within a given area simply because Congress has endowed it with *some* authority to act in that area" and invalidating the FCC's regulations because they were ultra vires) (quotation marks omitted, emphasis in original); *Pharm. Research & Mfrs. of Am. v. United States Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 37-45 (D.D.C. 2014) (invalidating HHS's orphan drug exclusion rule).

Here, too, HHS cannot meet its burden of demonstrating that "some statute confers upon it the power it purported to exercise."  *Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 398.  For this reason alone, the Challenged Provisions are unlawful and should be set aside.

**b.  HHS Exceeded Its Authority By Adopting Excessively Broad Definitions Of Statutory Text.[2]**

The Final Rule purports to do nothing more than implement the Abortion Refusal Statutes. *See, e.g.*, 45 C.F.R. § 88.3(a)-(c).  Yet the plain text of the Final Rule strays from and exceeds the substantive bounds of those laws, operating to impermissibly widen their scope and defined terms.

The United States Supreme Court has instructed that when federal agencies are "charged with administering congressional statutes . . . their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires."  *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297 (2013).  In determining whether agencies act in accordance with statutory authority, courts look to whether

---

*Planning and Reproductive Health Assoc. v. Ashcroft*, No. 04-2148(HHK), 2004 WL 3633834 (D.D.C. Dec. 24, 2004).

[2] Each of the Challenged Definitions can be found in full at 45 C.F.R. § 88.2 and Appendix A.

"Congress has directly spoken to the precise question at issue" by examining "the particular statutory language at issue, as well as the language and design of the statute as a whole." *Chemical Mfrs. Ass'n v. E.P.A.,* 919 F.2d 158, 162–63 (D.C. Cir. 1990). Here, the Final Rule does not seek to clarify, explain, or interpret the scope of the Abortion Refusal Statutes. Rather, it broadens the definitions of several key terms to expand these statutes beyond the bounds of their legislative origins.

**Health Care Entity.** The term "health care entity" is defined in the Coats-Snowe and Weldon Amendments. The Coats-Snowe Amendment defines "health care entity" to include "an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions." 42 U.S.C. § 238n(c)(2). The Weldon Amendment defines "health care entity" to include "an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan." 42 U.S.C. § 18113. The Final Rule ignores this plain language.

As illustrated in Appendix B, the definition of "health care entity" contained in the Final Rule goes far beyond Congress's definition of the term in the Coats-Snowe and Weldon Amendments. It includes entities excluded from the statutory definitions, such as pharmacies, health plan sponsors, and medical billing trainees. These entities have very different roles and functions from those included by Congress. To interpret "health care entity" so broadly violates the APA by exceeding the statutory authority granted by the underlying statutes. *See* 5 U.S.C. § 706(2)(C).

**Assist in the Performance.** The Final Rule defines "assist in the performance" to include "tak[ing] an action that has a specific, reasonable, and articulable connection to furthering a procedure or a part of a health service program or research activity undertaken by or with another person or entity." 45 C.F.R. § 88.2. This sweeps much more broadly than Congress contemplated, intended, or articulated.

The Church Amendments were passed in 1973 as a reaction to the United States Supreme Court decision in *Roe v. Wade* and a Federal District Court decision in Montana, which imposed a temporary restraining order "compelling a Catholic hospital, contrary to Catholic beliefs, to allow its facilities to be used for a sterilization operation." 119 Cong. Rec. S9595 (Mar. 27, 1973); *see also Taylor v. St. Vincent's Hospital*, 523 F.2d 75, 76 (9th Cir. 1975). As Senator Church's statements

during debate on the legislation make clear, "[t]he amendment is meant to give protection to the *physicians, to the nurses, to the hospitals themselves*, if they are religious affiliated institutions. . . . There is no intention here to permit a frivolous objection from someone unconnected with the procedure to be the basis for a refusal to perform what would otherwise be a legal operation." 119 Cong. Rec. S9595 (Mar. 27, 1973) (emphasis added).

Yet, the Final Rule's definition of "assist in the performance" extends the right of refusal well beyond this focused legislative intent.  It is not limited to individuals who are called upon to actively participate in medical procedures or services themselves, but rather extends to a universe of individuals who may bear little connection to the actual provision of health care.  For example, HHS explicitly intended for this definition to include decidedly non-medical tasks such as "[s]cheduling an abortion or preparing a room and the instruments for an abortion."  84 Fed. Reg. at 23186.  The Final Rule would also allow a hospital janitor to refuse to sterilize an operating room for an emergency surgery treating an ectopic pregnancy, or a receptionist to refuse to schedule a pre-operative consultation for a pregnant person considering whether to terminate a pregnancy.  Indeed, HHS admits that it "interprets 'assist in the performance' broadly and does not believe the presence of more specific terms of assistance elsewhere in the Church Amendments, or in other laws that are the subject of this rule, narrows the meaning of the phrase."  84 Fed. Reg. at 23188.  This unjustified expansion of religious refusals is contrary to the legislative history and the plain language and legislative history of the Church Amendments.

**Referral or Refer For.**  The Final Rule similarly defines "referral or refer for" well beyond what Congress intended in the Weldon and Coats-Snowe Amendments, sweeping in the "provision of information" in any form "where the purpose or reasonably foreseeable outcome . . . is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure."  45 C.F.R. § 88.2.  HHS defends the definition as "faithfully effectuat[ing] . . . Congress's protection of health care professionals and entities from being coerced or compelled to facilitate conduct (with respect to Weldon and Coats-Snowe, concerning abortion)."  84 Fed. Reg. at 23200.

Yet the new definition goes well beyond both statutes with respect to both who is covered and

what information constitutes a referral.  The Coats-Snowe Amendment anchors "refer" and "referral" to the training of induced abortions and applies only to an "individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions."  42 U.S.C. § 238n.  The Weldon Amendment uses the term "refer" in the context of abortion, stating that none of the funds appropriated in the Labor, Health and Human Services, Education, and Related Agencies Appropriations Act may be made available to government entities that discriminate against any "institutional or individual health care entity" because the entity "does not provide, pay for, provide coverage of, or refer for abortions."  Consolidated Appropriations Act of 2009, Pub. L. No. 111-117, § 508(d)(1), 123 Stat. 3034.  Moreover, the medical regulatory backdrop makes clear that Congress intended the word "referral" to have its normal meaning in a health care setting—for a doctor to direct a patient to another care provider for care.[3]  By contrast, HHS's new definition is not limited to either health care professionals or referrals related to abortion.  It would arguably extend to the provision of any information by anyone employed in the health care industry.

Under the Final Rule, a patient could be deprived of options or information relevant to their health and treatment, without even knowing that crucial information prerequisite to making informed decisions is being withheld from them.  This definition of "referral or refer for" goes far beyond any congressional authorization by the Coats-Snowe and Weldon Amendments, legislating new rights to asserting religious refusals untethered to abortion or medical care.

**Discriminate or Discrimination.**  The Final Rule's definition of "discriminate or discrimination" is broad and seemingly limitless.  *See* 45 C.F.R. § 88.2.  It is so expansive that it would give San Francisco's health industry workers an absolute right to assert religious refusals without consequence, without taking into account the City's need to provide effective and ethical patient care, or the needs of fellow coworkers.  Indeed, discrimination is defined so broadly as to

---

[3] *See, e.g.*, Medicare.gov, *Glossary-R*, https://www.medicare.gov/glossary/r (last visited June 3, 2019) (defining referral as "[a] written order from your primary care doctor for you to see a specialist or get certain medical services"); Ctrs. for Medicare & Medicaid Services, *Glossary*, https://www.cms.gov/apps/glossary/default.asp?Letter=R&Language (last visited June 3, 2019) ("Generally, a referral is defined as an actual document obtained from a provider in order for the beneficiary to receive additional services."); *id.* (a referral is a "written OK from your primary care doctor for you to see a specialist or get certain services").

include the provision of reasonable accommodations for religious practices, such as changing an employee's employment, title, or other similar status so that they can be moved into a role in which they would not encounter a religious conflict with their job duties.  For this reason, the Final Rule's definition of "discriminate or discrimination" violates the Establishment Clause, as discussed *infra*, at Part I.B.1.  The Abortion Refusal Statutes, by contrast, do not define the term "discrimination."  "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."  *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018).  Accordingly, this Court should assume that the Abortion Refusal Statutes did not intend to use the term "discrimination" in a manner that would authorize the Final Rule's definition to violate the Establishment Clause, and that the definition therefore exceeds statutory authority.

### 2.    The Challenged Provisions Are Contrary To Law.

The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency action is "not in accordance with law" when "it is in conflict with the language of [a] statute."  *See Nw. Envtl. Advocates v. U.S. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008).  The Challenged Definitions and Substantive Requirements are "not in accordance with law" because they conflict with, *inter alia*, EMTALA.  42 U.S.C. § 1395dd.

EMTALA requires hospitals to provide emergency care.  The law defines the term "emergency medical condition" to include "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy."  42 U.S.C. § 1395dd(e)(1)(A).

The Challenged Definitions and Substantive Provisions, however, establish a categorical right to refuse to treat a patient.  They contain no exceptions or protections to ensure that patients have adequate access to necessary health care in emergencies.  This means that individuals cannot be required to participate in a procedure they object to even in an emergency situation—and even if it puts the patient's health in serious jeopardy.[4]  This places it squarely in conflict with EMTALA.

---

[4] This is not what Representative Weldon intended when he proposed the Weldon Amendment.

1    This conflict was raised by many comments that were submitted in response to the proposed

2    rule.  *See, e.g.*, RJN Exs. F at 12, G at 11-12.  HHS could have addressed this problem easily in the

3    Final Rule by creating an exception for emergency care or clarifying that it does not disturb health care

4    providers' obligations to provide appropriate care in an emergency.  It did not.  Instead, HHS chose to

5    leave the categorical refusal-of-care rights in place, noting only that "the Department generally agrees

6    . . . that the requirement under EMTALA . . . does not conflict with Federal conscience and anti-

7    discrimination laws.  The Department intends to give all laws their fullest possible effect."  84 Fed.

8    Reg. at 23183; *see also id.* at 23188 ("[W]here EMTALA might apply in a particular case, the

9    Department would apply both EMTALA and the relevant law under this rule harmoniously to the

10   extent possible.").  This curt response does nothing to remedy the blatant conflict with EMTALA.

11   Accordingly, the Challenged Definitions and Substantive Provisions should be "h[e]ld unlawful and

12   set aside."  5 U.S.C. § 706(2)(A).

### 3.    The Final Rule Is Arbitrary And Capricious.

14       The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary" or

15   "capricious."  5 U.S.C. § 706(2)(A).   The Challenged Provisions are arbitrary and capricious because

16   HHS conducted and relied upon a deeply flawed cost-benefit analysis.

17       Agency action should be overturned as arbitrary and capricious when, among other things, the

18   agency: (i) relied on factors Congress did not intend for it to consider; (ii) failed to consider important

19   aspects of the problem it is addressing; or (iii) explained its decision counter to the evidence before it.

20   *Motor Veh. Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "As a

---

22   After a challenge to the Amendment was filed on the ground that it could inhibit the enforcement of
     statutes requiring hospitals to provide emergency abortion care, Representative Weldon explained that
23   his amendment did *not* disturb EMTALA's requirement that critical care facilities provide appropriate
     treatment to women in need of emergency abortions.  *See* 151 Cong. Rec. H176-02 (Jan. 25, 2005)
24   (statement of Rep. Weldon) ("The Hyde-Weldon amendment is simple.  It prevents Federal funding
     when courts and other government agencies force or require physicians, clinics and hospitals and
     health insurers to participate in *elective* abortions.") (emphasis added); *id.* (Weldon Amendment
25   "ensures that in situations where a mother's life is in danger a health care provider must act to protect
     the mother's life").
26       The legislative history of the Coats-Snowe Amendment indicates that it, too, was not intended
     to affect the provision of emergency care.  *See, e.g.*, 142 Cong. Rec. S2268-01, S2269 (March 19,
27   1996) (statement of Senator Coats in support of his Amendment) ("a resident needs not to have
     [previously] performed an abortion … to have mastered the procedure to protect the health of the
28   mother if necessary").

---

general rule, the costs of an agency's action are a relevant factor that the agency must consider before deciding whether to act." *Mingo Logan Coal Co. v. Envtl. Prot. Agency*, 829 F.3d 710, 732–33 (D.C. Cir. 2016).  Thus, where—as here[5]—"an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. E.P.A.,* 682 F.3d 1032, 1039–40 (D.C. Cir. 2012); *see also California v. Azar*, No. 19-CV-01184-EMC, 2019 WL 1877392, at *37-41 (N.D. Cal. Apr. 26, 2019).  HHS's cost-benefit analysis is so deeply flawed as to render the Final Rule arbitrary and capricious.

a.  **The Claimed Benefits Are Speculative And Unsupported.**

In articulating the alleged benefits of the Final Rule, HHS's primary contention is that it will increase the number of health care providers, thereby increasing access to health care and improving patient outcomes.  *See* 84 Fed. Reg. at 23246-23255.  That these purported benefits are no more than conjecture on the part of HHS is apparent from the language it uses to discuss its assertion.  HHS states that the rule is "expected" to encourage more people to enter the profession.  *Id.* at 23247.  It candidly acknowledges that it "is not aware, however, of data enabling it to quantify any effect the rule may have on increasing the number of health care providers or the possible result of increasing access to care."  *Id.*  It merely "assumes" the Final Rule will result in a greater number of providers and "believes it is reasonable to conclude that the rule will increase, or at least not decrease, access to health care providers and services."  *Id.*

This "assumption" is based primarily on decade-old polling conducted by then-Republican pollster—and now-White House advisor—Kellyanne Conway.  In 2009, Conway's company was hired by the Christian Medical and Dental Association to conduct polling concerning "conscience rights" in health care.  RJN Ex. B.  They conducted two phone surveys of American adults and an online survey of members of faith-based medical organizations, including 2,298 members of the Christian Medical Association.  RJN Exs. B, C.

HHS cites to Conway's results a dozen times in the Final Rule.  *See, e.g.*, 84 Fed. Reg. at

---

[5] In promulgating the Final Rule, HHS conducted an economic and regulatory impact analysis as required by "Executive Order 12866 on Regulatory Planning and Review" and "Executive Order 13563 on Improving Regulation and Regulatory Review," and relied on the cost-benefit analysis in promulgating the Final Rule.  84 Fed. Reg. at 23226-23227, 23239-23255.

23246 n.309; *id.* at 23247 nn.316-18; *id.* at 23253 nn.347 & 349.  No other survey is cited more frequently and no other data is more central to HHS's argument.  But this data cannot bear the weight HHS places upon it.  The research was conducted approximately a decade ago, before the U.S. health care system was reshaped by the Affordable Care Act and a wave of industry mergers.  It was commissioned by an association that has as strongly promotes "Rights of Conscience."  *See* RJN Ex. D.  And the respondents who participated in the online survey—which generated most of the statistics HHS relies on—were "self-selecting."  RJN Ex. B at 4.  Accordingly, even Conway herself acknowledged that the poll was only "intended to demonstrate the views and opinions of members surveyed [and was] . . . not intended to be representative of the entire medical profession [or even] of the entire membership rosters of these organizations."  *Id.*[6]

In short, the principal benefit HHS advances is unsubstantiated by competent evidence.

### b.     HHS Did Not Adequately Consider Harm To Patients.

In response to the proposed rule, commenters submitted substantial evidence that the Final Rule would impose significant harm on individual patients and public health systems.  HHS ignored or gave unreasonably short shrift to these costs.  Numerous comments explained that the Rule would necessarily result in patients being denied, or at the very least delayed in accessing, health care services.  *See, e.g.*, RJN Exs. I at 12, J at 3-4, K at 3-4, L at 10-17.  In emergency situations, like ectopic pregnancies, this can significantly jeopardize individuals' health and welfare.  And in time-sensitive procedures like abortion, any such delay can increase medical risks and costs.  HHS acknowledges that "[d]ifferent types of harm can result from denial of a particular procedure" and that a "patient's health might be harmed if an alternative is not readily found, depending on the condition."  84 Fed. Reg. at 23251.  But other than arguing that the Final Rule will increase access to care by

---

[6] In the proposed rule, Conway's 2009 survey was cited only once and only for the limited proposition that 39% of respondents faced pressure or discrimination from administrators or faculty based on their moral, ethical, or religious beliefs.  84 Fed. Reg. at 23175 & n.15.  If San Francisco had known that HHS would rely on Conway's 2009 and 2011 polls so extensively to support a broad assertion that the Final Rule will increase access to Health Care, San Francisco would have addressed the shortcomings of the survey in its comment on the proposed rule.  In such circumstances, where "the failure to notify interested persons of the scientific research upon which the agency was relying actually prevented the presentation of relevant comment, the agency may be held not to have considered all 'the relevant factors.'"  *United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 251 (2d Cir. 1977).  For this reason, too, the Final Rule should be deemed arbitrary and capricious.

encouraging people to enter the medical field, HHS relies solely on irrelevant and unsupported responses to these significant concerns.

HHS first proclaims that these harms would "also be applicable for denials of care based on, for example, inability to pay the requested amount." 84 Fed. Reg. at 23251. This is a non-sequitur. The tragic fact that some individuals are unable to afford health care does not justify expanding the circumstances in which people will be denied access to potentially critical and/or time-sensitive services. The Department next implies that commenters' concerns about the burden on access to services is overstated because "[s]ome persons, out of respect for the beliefs of providers, may want a service but not take any offense, nor deem it any burden on themselves, for the provider to not provide that service to them." *Id.* HHS provides no substantiating basis or analysis to support or quantify this notion. Finally, HHS minimizes the impact of delays associated with refusal to refer for abortion services based on its conclusion—seemingly based on a Google search by an HHS employee for "find abortion clinic near me"—that "information about how to obtain an abortion is relatively easy to find." *Id.* at 23253 & n.354. For the agency charged with "protecting the health of all Americans and providing essential human services" to say that a doctor's advice and guidance can be replaced by a Google search is outrageous and dangerous.

Similarly, many comments explained that the Final Rule would exacerbate already enormous deficiencies in health care access among LGBTQ and gender non-conforming individuals, potentially dissuading people from seeking even the most routine services due to fear that they will be discriminated against or otherwise mistreated. *See, e.g.*, RJN Ex. E at 2. Some of these comments cited studies on, for example, the impact of discriminatory state laws on health disparities among LGBTQ individuals. *See, e.g.*, *id.* Ex. N. Many others included personal stories and anecdotal evidence of individuals delaying or avoiding accessing health care out of fear of discrimination. *Id.* Ex. M at 15. HHS fails to adequately consider these comments and concerns.

HHS summarily disregards all of the studies and other evidence presented in the comments because the studies did not directly address the impact of religious refusal rules on health care disparities (*see* 84 Fed. Reg. at 23251-23252), and the evidence did not allow the Department to precisely quantify the impact the final rule would have on these disparities and the "avoidance

phenomenon" described in comments (*id.* at 23252-23253).  And HHS argues that these concerns are misplaced because, as discussed above, "[t]he Department expects any decreases in access to care to be outweighed by significant overall increases in access generated by this rule."  *Id.* at 23252.

In short, "the determination by HHS that the asserted but unsubstantiated, undocumented, and speculative benefits of the Final Rule outweigh its likely substantial costs indicates the agency 'put a thumb on the scale by [over]valuing the benefits and [under]valuing the costs.'"  *California v. Azar*, 2019 WL 1877392, at *41 (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198 (9th Cir. 2008)).  The cost-benefit analysis is undermined by "serious flaw[s]" that "render the rule unreasonable" under the APA.  *Nat'l Ass'n of Home Builders*, 682 F.3d at 1039-40.  Accordingly, the Challenged Provisions should be set aside.[7]

### B.     The Final Rule Violates The Constitution.

#### 1.     The Challenged Provisions Violate Separation Of Powers.

By mandating that recipients of HHS funds comply with substantive, legislative rule-making that exceeds the bounds of Congressional action (*see* Part I(A)(1), *supra*), HHS has also violated fundamental separation of powers principles.  The Constitution grants *Congress*—not the Executive Branch—the power to impose conditions on federal funds.  *See* U.S. Const. art. I, § 8, cl. 1; *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("*Dole*").  The Executive Branch, therefore, "does not have unilateral authority to refuse to spend . . . funds" that have been appropriated by Congress "for a particular project or program."  *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).  But HHS seeks to do precisely that.  It threatens to withhold hundreds of millions of dollars of critical federal funds if entities like San Francisco, fail to comply with its provisions.  In so doing, HHS is amending federal conscience laws without any authority to do so, unilaterally adding funding conditions, usurping the role of Congress, and violating separation of powers principles.  *See Clinton v. City of New York*, 524 U.S. 417, 439 (1998).

#### 2.     The Challenged Enforcement Provisions Violate The Spending Clause.

The Enforcement Provisions are unconstitutional because HHS purports to exercise the

---

[7] Although the Final Rule is arbitrary and capricious in its entirely, San Francisco only seeks preliminary relief as to the provisions that will cause the City imminent harm.

spending power in ways that even Congress could not.  The Final Rule requires San Francisco, "as a condition of the approval, renewal, or extension of any Federal financial assistance or Federal funds from" HHS to provide Certifications and Assurances of its compliance.  *See* 45 C.F.R. § 88.4(a)(1)-(2).  If San Francisco is unable to do so, or if it were to do so and then be found in violation of the Final Rule, the consequences are drastic—the Enforcement Provisions would deny the City all current and future HHS funding.  *See* 45 C.F.R. § 88.7(i)(3)(iv)-(v) (allowing that HHS may "[t]erminat[e] . . . Federal Funds from the Department, in whole or in part" and "[d]eny[] or withold[], in whole or in part, new . . . Federal funds from the Department").

Congress's spending power is not unlimited.  *Dole*, 483 U.S. at 207.  Congress may enact spending conditions that are not unduly coercive and relate to Congress's purpose in spending the funds.  *Id.* at 207-08.  But violating either of these requirements renders the Enforcement Provisions unconstitutional.  *Id.*  Here, the Enforcement Provisions violate both of them.[8]

### a.    The Consequence Of Losing All HHS Funds Is Coercive.

While the federal government "may use its spending power to create incentives for States," the spending power may not be used to "exert a power akin to undue influence."  *Nat'l Fed'n  of Indep. Bus. v. Sibelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J.) (internal quotation omitted).  Thus, when "pressure turns into compulsion, the legislation runs contrary to our system of federalism."  *Id.* at 577-78 (internal quotation omitted).

The Enforcement Provisions cross that line by threatening $1 billion in HHS funds, constituting approximately 10.2% of San Francisco's total FY 17-18 annual operating budget of $10.1 billion, and approximately 20.1% of its total FY 17-18 General Fund budget of $5.1 billion.  Rosenfield Decl. ¶ 8.  HHS funds comprise approximately one-third of SFDPH's budget, and include 100 percent of funding for certain programs, such as Medicare, that are critical to the lives of San Francisco's residents.  Wagner Decl. ¶¶ 3-4; Rosenfield Decl. ¶¶ 5-6.  It would be catastrophic for San Francisco to lose all of these funds.  Colfax Decl. ¶ 23; Wagner Decl. ¶ 5; Colwell Decl. ¶¶ 11-14.

A threat of this magnitude "crosse[s] the line distinguishing encouragement from coercion."

---

[8] San Francisco does not concede that the Final Rule complies with other constitutional limitations on the spending power (*see Dole,*  483 U.S. at 207-08), but does not move on these bases.

*Sebelius*, 567 U.S. at 579 (quotation omitted) (opinion of Roberts, C.J.).  In *Sebelius*, the impending

loss of over 10 percent of a state's budget was deemed "economic dragooning that leaves the States

with no real option but to acquiesce."  *Id.* at 582.  The exact same analysis applies here.  As in

*Sebelius*, that Enforcement Provisions are "much more than 'relatively mild encouragement'—[they

are] a gun to the head."  *Id.* at 581.

### b.  Much Of The Threatened Funding Is Unrelated To The Final Rule.

The Enforcement Provisions also violate the requirement that conditions imposed on federal

grants must be "reasonably related to the purpose of the expenditure."  *New York v. United States*, 505

U.S. 144, 172 (1992); *see also Massachusetts v. United States*, 435 U.S. 444, 461 (1978).  Here, there

is no reasonable relationship between large amounts of the funds threatened by the Enforcement

Provisions and San Francisco's compliance with the Rule.  Over one hundred million dollars of HHS

funds are received by San Francisco each year to provide critical benefits and services to some of San

Francisco's most needy residents through programs such as Temporary Assistance to Needy Families

and Foster Care.  Rosenfield Decl. ¶ 5 ($58,360,424 for TANF and $34,718,746 for Foster Care).

There is no conceivable relationship between these entitlement programs and religious refusals

protected under the Final Rule.  These programs are unrelated to the activities that are the subjects of

the Abortion Refusal Statutes.  The programs do not involve the performance of, paying for, coverage

of, referral for, or training for sterilizations or abortions.  Indeed, protected healthcare workers do not

administer these programs.  Withholding funds for welfare and foster care is simply not related to the

Final Rule's stated objective of protecting the conscience rights of healthcare workers and entities.

### 3.  The Definition Of "Discrimination" Violates The Establishment Clause.

The Final Rule offends the Establishment Clause because it "commands that . . . religious

concerns automatically control over all secular interests at the workplace."  *Estate of Thornton v.

Caldor, Inc.*, 472 U.S. 703, 709 (1985) ("*Caldor*").  It includes a blanket directive to San Francisco, an

employer managing an extremely complex health care network with thousands of employees, that it

"shall not discriminate against any physician or other health care personnel . . . because he refused to

perform or assist in the performance of any" lawful health service or research activity that "would be

contrary to his religious beliefs or moral convictions."  45 C.F.R. § 88.3(a)(2)(v)).  In turn, the Final

Rule defines "discrimination" to include taking any action or enforcing any policy that subjects

covered workers "to any adverse treatment." *Id.* at § 88.2.  It allows that an employer may avoid

"discriminating" if it offers an "effective accommodation" of the worker's religious belief, but even

then, the worker must *voluntarily* accept the accommodation.  *Id.*  In thus conferring upon religious

workers an absolute ability to refuse to perform job duties that are vital to the employer's mission, and

even the right to reject an "effective accommodation" without consequence, the Final Rule "afford[s] a

uniform benefit to *all* religions," such that its constitutionality is determined by applying the tests set

forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  *Larson v. Valente*, 456 U.S. 228, 252 (1982).

The definition of discrimination as incorporated into the Challenged Substantive Requirements

violates the Establishment Clause if it fails any one of the three *Lemon* tests.  It fails, at least, the

second: its "principle or primary effect . . . advances . . . religion."[9]  *Lemon*, 403 U.S. at 612-13.  In

*Caldor*, the Supreme Court struck down a law under the second *Lemon* test that endowed sabbatarians

"with an absolute and unqualified right not to work on whatever day they designate as their Sabbath."

*Caldor*, 472 U.S. at 709.  Like the law at issue in *Caldor*, the Final Rule "relieve[s] [workers] of the

duty to work" when doing so is against their religious beliefs or moral convictions, "no matter what

burden or inconvenience this imposes on the employer or fellow workers."  *Id.* at 708-09.  The Final

Rule, like the statute struck down in *Caldor*, "imposes on employers and employees an absolute duty

to conform their business practices to the particular religious practices of the employee."  *Id.* at 709.  It

demands that San Francisco "adjust [its] affairs to the command of the State whenever [the Final Rule]

is invoked by an employee."  *Id.*  "There is no exception . . . for special circumstances, such as . . . .  if

a high percentage of an employer's work force asserts rights" to refuse to perform particular tasks or

"when the employer's compliance would require the imposition of significant burdens on other

employees required to work in the place of" employees making religious refusals.  *Id.*

While "the 'government may . . . accommodate religious practices . . . without violating the

Establishment Clause'. . . '[a]t some point,' . . . accommodation may devolve into 'an unlawful

fostering of religion.'"  *Cutter v. Wilkinson*, 544 U.S. 709, 713-14 (2005) (internal quotations omitted).

---

[9] San Francisco does not concede that the Final Rule passes either of the other two *Lemon* tests
(*Lemon*, 403 U.S. at 612-13); however, San Francisco does not move on those grounds.

This line is crossed by the Final Rule because it provides a legal directive protecting religious workers that "takes no account of the convenience or interest of the employer or those of other employees who do not observe." *Caldor*, 472 U.S. at 709.

The Establishment Clause "'gives no one the right to insist that in the pursuit of their own interests, others must conform their conduct to his own religious necessities.'" *Id.* at 710 (quoting *Otten v. Baltimore & Ohio R. Co.*, 205 F.3d 58, 61 (1953) (Hand, J.)). The definition of "discriminate or discrimination" must be struck down because it would have the City conform its healthcare mission to its workers' pursuit of their religious ideals.

## II.     San Francisco Will Suffer Irreparable Harm In The Absence Of Preliminary Relief.

Unless this Court grants preliminary relief, on July 22, 2019, San Francisco will be required to change its policies and practices to ensure full compliance with the Challenged Provisions—or risk losing all of its HHS funds. Either outcome will cause irreparable harm to the City, as both will undermine SFDPH's mission to protect and promote the health and well-being of all in San Francisco.

San Francisco has established policies and procedures that strike a thoughtful and appropriate balance between personnel's religious beliefs and SFDPH's mission—indeed, obligation—to provide high quality inclusive care to all patients. For example, ZSFG Administrative Policy 5.15 ("Policy") "establish[es] guidelines for processing [a] staff member's requests not to participate in patient care in a manner which ensures continuity of quality patient care." It states:

> In the event that a staff member feels reluctant to participate in an aspect of patient care because the patient's condition, treatment plan, or physician's orders are in conflict with the staff member's religious beliefs, cultural values or ethics, the staff member's written request for accommodation will be considered *if the request does not negatively affect the quality of patient's care.*

> In situations where the immediate nature of the patient's needs do not allow for the substitution of personnel, *the patient's right to receive the necessary quality patient care will take precedence over the staff member's individual beliefs and rights until other competent personnel can be provided.*

Chen Decl. Ex. A (emphasis added). The Policy explains that "[a]n accommodation may include personnel substitutions through a change in patient assignment or transfer of the staff member to a different patient care area in accordance with organizational standards." *Id.* It is also clear in the Policy that the individual's "manager and/or supervisor must determine if the staff member's request for accommodation negatively affects the quality of the patient's care," and "[i]f the patient's needs do

not allow for the substitution of personnel, the manager and/or supervisor must inform the staff member to stay at their post until other competent personnel can be provided." *Id.* In other words, although accommodations—which may include transferring individuals to another area—will be made when possible, individuals may be required to participate in medical procedures despite a moral, religious, or ethical objection if a patient's needs require it and a staffing change cannot be made. *See also* Declaration of Ron Weigelt ¶ 4 (discussing conscientious objector provision in San Francisco's contract with its nurses).

San Francisco's policies and procedures reflect SFDPH's respect for the religious and moral beliefs of its staff, as well as its paramount responsibility and commitment to serve the needs of its patients. They represent a careful balancing of the important interests at issue in this area. But these policies put San Francisco in violation of the Challenged Provisions. Requiring personnel to participate in a procedure as necessary to protect a patient's life or health unless and until other competent personnel can be assigned is contrary to the categorical right to refuse to provide essential services enshrined in the Final Rule. Transferring staff members to a different department to accommodate their request not to perform responsibilities of their current position could run afoul of the broadly defined prohibition on "discriminate or discrimination" based on religious objection.

Accordingly, if the Challenged Provisions go into effect, unless San Francisco forgoes HHS funds, the City would be required to amend the Policy, and others like it, to excuse individuals from assisting with procedures they object to even if patient care would be compromised. If implemented, patients could die. This is neither hyperbole nor hypothetical. Every day, patients present in the ZSFG emergency room with life threatening conditions. Colwell Decl. ¶ 7. Many times every month, those conditions involve serious complications relating to pregnancy or a sexually transmitted disease/infection. *Id.* A team member opting out of those patients' treatment would put their health— and even lives—at serious risk. *Id.* For example, a young woman recently presented at the ZSFG emergency room who had bled substantially into her abdomen due to an ectopic pregnancy. Her condition was critical. If any member of the team responsible for her care had opted out of her treatment for any reason, the woman would have died before other competent personnel could have been substituted in. *Id.* at ¶ 8. It is difficult to imagine what could undermine SFDPH's mission more

than having to adopt policies that will result in preventable and unnecessary deaths.

San Francisco would also be required to alter its policies and practices to prohibit involuntarily transfers of individuals who have a religious or moral objection to performing critical aspects of their job.  The inability to involuntary transfer employees if necessary will impede the ability of hospitals and clinics to function efficiently (*see* Colfax Decl. ¶ 22; Drey Decl. ¶ 7) and have significant negative consequences for individual and public health.  For example, if call operators or receptionists who refuse to direct patients to the Women's Option Center or to schedule appointments for women seeking abortions or other sexual and reproductive health care could not be transferred to a different position, the effects will be significant.  At best, patients and potential patients will be delayed in accessing care.  Drey Decl. ¶ 6; Nestor Decl. ¶ 8.  For time-sensitive procedures like abortion, this is particularly problematic because any delay increases medical risks and costs.  Drey Decl. ¶ 6.  At worst, patients may not be able to obtain safe abortion care at all.  Tragically, this sometimes results in women taking desperate measures such as throwing themselves in front of moving traffic or having their partners beat them in the abdomen to try to self-induce termination of their pregnancies.  *Id.*

Similarly, SFDPH needs to be able to transfer front-line staff, such as receptionists and call operators, who refuse to direct transgender patients seeking transition-related services to the appropriate department or to schedule appointments for them.  If those individuals cannot be transferred, individuals will be deterred from accessing safe transition-related health care.  Zevin Decl. ¶ 6.  In such circumstances, some patients will turn to dangerous alternatives like black market hormones and industrial grade silicone injections, which can have dire health consequences.  *Id.*  In addition, those patients' risk of suicide will increase significantly.  *Id.* at ¶ 7.

Finally, if the Challenged Provisions go into effect, evidence demonstrates that patients—particularly LGBTQ people and other vulnerable populations—will delay seeking medical care based on fear of being discriminated against or mistreated in healthcare facilities.  Colfax Decl. ¶ 22; Pardo Decl. ¶¶ 9-13.  These delays in seeking care will lead to worse individual and public health outcomes, as well as higher costs to San Francisco's healthcare system.  Colfax Decl. ¶ 22.

In short, compliance with the Challenged Provisions will put patient health at risk and harm SFDPH's public health and organizational mission. The alternative, however, could be even worse.  If

San Francisco does not come into full compliance with the Challenged Provisions, it will be at risk of losing all of its HHS funds. *See* 45 C.F.R. § 88.7(i)(3). This would be catastrophic. As discussed above (*see* Part I(B)(2)(a), *supra*), HHS funds make up approximately one-third of SFDPH's total budget, nearly 40% of Zuckerberg San Francisco General's budget, and over 60% the budget for Laguna Honda Hospital. Wagner Decl. ¶ 4. Accordingly, SFDPH would have to restructure the entire public health system with a drastic reduction in services. Hospital beds, behavioral health clinics, primary care clinics, and emergency services would all have to be significantly reduced. Hundreds of employees would likely lose their jobs. People in need of urgent health care might not be able to receive timely services, and could die as a result. In the event of an earthquake or other catastrophic event, the health and safety of the entire region could be compromised. In short, termination of all HHS funds would cause a loss of critical health care capacity for San Francisco and the region. Colfax Decl. ¶ 23; Wagner Decl. ¶¶ 3-5; *see also* Nestor Decl. ¶¶ 9-16, Siador Decl. ¶¶ 3-8.

And not just SFDPH would be impacted. In the fiscal year ending June 2018, San Francisco expended over $58 million in TANF funds, nearly $35 million in Title IV-E Foster Care funds, $10 million in adoption assistance funds, and $8 million is child support enforcement funds. Rosenfield Decl. ¶ 5. In all, San Francisco receives nearly $1 billion in HHS funding. *Id.* at ¶ 4. To fully absorb the loss of all HHS funds for even a single year, San Francisco would have to deplete its reserves, suspend capital projects needed to maintain the City's aging infrastructure, and make drastic service cuts in order to maintain a balanced budget, as it is legally required to do. All of these actions would result in significant job losses and the abandonment of key safety net services. *Id.* at ¶ 10.

If the Challenged Provisions are not enjoined, this budgetary sword of Damocles will rise over San Francisco on July 22, 2019.

## III. The Balance Of Equities And Public Interest Favor A Preliminary Injunction.

The balance of the equities and the public interest favor an injunction. When the government is a party, these factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). And in a case involving an alleged constitutional violation, the two factors are satisfied by success on the merits of the underlying claim. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("it is always in the public

1  interest to prevent the violation of a party's constitutional rights").  This is because Defendants

2  "cannot suffer harm from an injunction that merely ends an unlawful practice."  *Rodriguez v. Robbins*,

3  715 F.3d 1127, 1145 (9th Cir. 2013).  By contrast, there would be serious harm to San Francisco if the

4  Challenged Provisions were to take effect.  *See* Part II, *supra*.

5  **IV.    Nationwide Relief Is Appropriate In The Circumstances Presented Here.**

6          This Court has the discretion to issue a nationwide injunction in this action.  *See Texas v.*

7  *United States*, 809 F.3d 134, 188 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271

8  (2016); *see also Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952) ("[T]he District Court in

9  exercising its equity powers may command persons properly before it to cease or perform acts outside

10 its territorial jurisdiction.").  This is because "the scope of injunctive relief is dictated by the extent of

11 the violation established, not by the geographical extent of the plaintiff."  *Califano v. Yamasaki*, 442

12 U.S. 682, 702 (1979).  Where a federal law, regulation, or other requirement is invalid on its face, a

13 nationwide injunction prohibiting its enforcement is appropriate.  *Nat'l Min. Ass'n v. U.S. Army Corps*

14 *of Eng'rs*, 45 F.3d 1399, 1410 (D.C. Cir. 1998).

15         Here, the nature of the violation is the imposition of Challenged Provisions that are in violation

16 of the APA, without Congressional authority, and unconstitutional.  These violations are nationwide;

17 the Final Rule does not contain a geographic or entity limitation in its application.  While San

18 Francisco is the only plaintiff in this action, all recipients of HHS funds are subject to the same

19 unconstitutional actions.  Absent a nationwide injunction, hundreds of jurisdictions and entities subject

20 to the Final Rule would be forced to bring actions to protect their rights and ensure that critical funds

21 are not unconstitutionally stripped from them.  For these reasons, a nationwide injunction that

22 prohibits Defendants from enforcing the Challenged Provisions is warranted.

23                                              **CONCLUSION**

24         For the foregoing reasons, San Francisco requests that this Court grant the relief requested and

25 enjoin the Challenged Provisions from going into effect.

26 / / /

27 / / /

28 / / /

1    Dated:   June 3, 2019

2                                            DENNIS J. HERRERA
                                             City Attorney
3                                            JESSE C. SMITH
                                             RONALD P. FLYNN
4                                            YVONNE R. MERÉ
                                             SARA J. EISENBERG
5                                            JAIME M. HULING DELAYE
                                             Deputy City Attorneys
6

7                                    By: */s/ Sara J. Eisenberg*
                                             SARA J. EISENBERG
8                                            Deputy City Attorney

9                                            Attorneys for Plaintiff
10                                           CITY AND COUNTY OF SAN FRANCISCO

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX A

**45 C.F.R. § 88.2 Definitions [Excerpted]**

*Assist in the performance* means to take an action that has a specific, reasonable, and articulable connection to furthering a procedure or a part of a health service program or research activity undertaken by or with another person or entity.  This may include counseling, referral, training, or otherwise making arrangements for the procedure or a part of a health service program or research activity, depending on whether aid is provided by such actions.

*Discriminate* or *discrimination* includes, as applicable to, and to the extent permitted by, the applicable statute:

(1) To withhold, reduce, exclude from, terminate, restrict, or make unavailable or deny any grant, contract, subcontract, cooperative agreement, loan, license, certification, accreditation, employment, title, or other similar instrument, position, or status;

(2) To withhold, reduce, exclude from, terminate, restrict, or make unavailable or deny any benefit or privilege or impose any penalty; or

(3) To utilize any criterion, method of administration, or site selection, including the enactment, application, or enforcement of laws, regulations, policies, or procedures directly or through contractual or other arrangements, that subjects individuals or entities protected under this part to any adverse treatment with respect to individuals, entities, or conduct protected under this part on grounds prohibited under an applicable statute encompassed by this part.

(4) Notwithstanding paragraphs (1) through (3) of this definition, an entity subject to any prohibition in this part shall not be regarded as having engaged in discrimination against a protected entity where the entity offers and the protected entity voluntarily accepts an effective accommodation for the exercise of such protected entity's protected conduct, religious beliefs, or moral convictions. In determining whether any entity has engaged in discriminatory action with respect to any complaint or  compliance review under this part, OCR will take into account the degree to which an entity had implemented policies to provide effective accommodations for the exercise of protected conduct, religious beliefs, or moral convictions under this part and whether or not the entity took any adverse action against a protected entity on the basis of protected conduct, beliefs, or convictions before the provision of any accommodation.

(5) Notwithstanding paragraphs (1) through (3) of this definition, an entity subject to any prohibition in this part may require a protected entity to inform it of objections to performing, referring for, participating in, or assisting in the performance of specific procedures, programs, research, counseling, or treatments, but only to the extent that there is a reasonable likelihood that the protected entity may be asked in good faith to perform, refer for, participate in, or assist in the performance of, any act or conduct just described. Such inquiry may only occur after the hiring of, contracting with, or awarding of a grant or benefit to a protected entity, and once per calendar year thereafter, unless supported by a persuasive justification.

(6) The taking of steps by an entity subject to prohibitions in this part to use alternate staff or methods to provide or further any objected-to conduct identified in paragraph (5) of this definition would not, by itself, constitute discrimination or a prohibited referral, if such entity does not require any additional action by, or does not take any adverse action against, the objecting protected entity (including individuals or health care entities), and if such methods do not exclude protected entities from fields of practice on the basis of their protected objections. Entities subject to prohibitions in this part may also inform the public of the availability of alternate staff or methods to provide or further the objected-to conduct, but such entity may not do so in a manner that constitutes adverse or retaliatory action against an objecting entity.

*Health care entity* includes:

(1) For purposes of the Coats-Snowe Amendment (42 U.S.C. 238n) and the subsections of this part implementing that law (§88.3(b)), an individual physician or other health care professional, including a pharmacist; health care personnel; a participant in a program of training in the health professions; an applicant for training or study in the health professions; a post-graduate physician training program; a hospital; a medical laboratory; an entity engaging in biomedical or behavioral research; a pharmacy; or any other health care provider or health care facility.  As applicable, components of State or local governments may be health care entities under the Coats-Snowe Amendment; and

(2) For purposes of the Weldon Amendment (*e.g.*, Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019, and Continuing Appropriations Act, 2019, Pub. L. 115-245, Div. B., sec. 507(d), 132 Stat. 2981, 3118 (Sept. 28, 2018)), Patient Protection and Affordable Care Act section 1553 (42 U.S.C. 18113), and to sections of this part implementing those laws (§ 88.3(c) and (e)), an individual physician or other health care professional, including a pharmacist; health care personnel; a participant in a program of training in the health professions; an applicant for training or study in the health professions; a post-graduate physician training program; a hospital; a medical laboratory; an entity engaging in biomedical or behavioral research; a pharmacy; a provider-sponsored organization; a health maintenance organization; a health insurance issuer; a health insurance plan (including group or individual plans); a plan sponsor or third-party administrator; or any other kind of health care organization, facility, or plan.  As applicable, components of State or local governments may be health care entities under the Weldon Amendment and Patient Protection and Affordable Care Act section 1553.

*Referral* or *refer for* includes the provision of information in oral, written, or electronic form (including names, addresses, phone numbers, email or web addresses, directions, instructions, descriptions, or other information resources), where the purpose or reasonably foreseeable outcome of provision of the information is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure.

# APPENDIX B

| Statutory Source | Statutory Language | Final Rule Definition |
|---|---|---|
| Coats-Snowe Amendment (42 U.S.C. § 238n(c)(2)) | *Health care entity* includes:<br>• an individual physician;<br>• a postgraduate physician training program; and<br>• a participant in a program of training in the health professions. | *Health care entity* includes:<br>• an individual physician or other health care professional, including a pharmacist;<br>• health care personnel;<br>• a participant in a program of training in the health professions;<br>• an applicant for training or study in the health professions;<br>• a post-graduate physician training program;<br>• a hospital;<br>• a medical laboratory;<br>• an entity engaging in biomedical or behavioral research;<br>• a pharmacy;<br>• any other health care provider or health care facility; or<br>• components of State or local governments. |
| Weldon Amendment (*See, e.g.*, Consolidated Appropriations Act of 2009, Pub. L. No. 111-117, § 508(d)(2), 123 Stat. 3034)<br><br>Patient Protection and Affordable Care Act (42 U.S.C. § 18113) | *Health care entity* includes:<br>• an individual physician or other health care professional;<br>• a hospital;<br>• a provider-sponsored organization;<br>• a health maintenance organization;<br>• a health insurance plan; or<br>• any other kind of health care facility, organization, or plan. | *Health care entity* includes:<br>• an individual physician or other health care professional, including a pharmacist;<br>• health care personnel;<br>• a participant in a program of training in the health professions;<br>• an applicant for training or study in the health professions;<br>• a post-graduate physician training program;<br>• a hospital;<br>• a medical laboratory;<br>• an entity engaging in biomedical or behavioral research;<br>• a pharmacy;<br>• a provider-sponsored organization;<br>• a health maintenance organization;<br>• a health insurance issuer;<br>• a health insurance plan (including group or individual plans);<br>• a plan sponsor or third-party administrator;<br>• any other kind of health care organization, facility, or plan; or<br>• components of State or local governments. |