1

2

3

4

5

6                          IN THE UNITED STATES DISTRICT COURT

7

8                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

CITY AND COUNTY OF SAN
FRANCISCO,                                          No. C 19-02405 WHA

            Plaintiff,                              *Related to*

    v.                                              No. C 19-02769 WHA
                                                           *and*
ALEX M. AZAR II, Secretary of U.S.                  No. C 19-02916 WHA
Department of Health and Human Services;
ROGER SERVERINO, Director, Office for
Civil Rights, Department of Health and
Human Services; U.S. DEPARTMENT OF                  **ORDER RE MOTIONS TO**
HEALTH AND HUMAN SERVICES; and                      **DISMISS AND FOR SUMMARY**
DOES 1–25,                                          **JUDGMENT AND REQUESTS**
                                                    **FOR JUDICIAL NOTICE**
            Defendants.
                                          /

**INTRODUCTION**

        In these challenges to a final agency rule allowing those with religious, moral, or other

conscientious objections to refuse to provide abortions and certain other medical services,

federal defendants move to dismiss or, in the alternative, for summary judgment.  Plaintiffs

oppose and also move for their own summary judgment.  For the following reasons, defendants'

motion to dismiss is **DENIED**.  To the extent stated below, plaintiffs' motion for summary

judgment is **GRANTED**.

**STATEMENT**

        Following *Roe v. Wade*, 410 U.S. 113 (1973), at least one religiously affiliated hospital

became forced by a court to allow its facilities to be used for abortion procedures.  *See, e.g.,*

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

*Taylor v. St. Vincent's Hospital*, 369 F. Supp. 948 (D. Mont. 1973).  That provoked the first federal statute to ensure that federally-financed hospitals as well as doctors, among others, could refuse to perform such procedures on grounds of conscientious objection.  Over the years, the right to refuse on such grounds has received yet more attention in further contexts via federal statutes.  Defendant United States Department of Health and Human Services (HHS) has recently promulgated a rule that, plaintiffs say, expands these protections beyond what Congress intended and will hamstring the delivery of health care.  Plaintiffs fear losing important federal grants as a result of their inability to comply with the new rule.

Under the new rule, to preview just one example, an ambulance driver would be free, on religious or moral grounds, to eject a patient en route to a hospital upon learning that the patient needed an emergency abortion.  Such harsh treatment would be blessed by the new rule.  One important question presented herein is the extent to which such scenarios conflict with the underlying statutes themselves.  Although this order does not accept all of plaintiffs' criticisms, this order holds that the new rule conflicts with those statutes in a number of ways and upsets the balance drawn by Congress between protecting conscientious objections versus protecting the uninterrupted effective flow of health care to Americans.

### 1.   HISTORY OF CONSCIENCE STATUTES.

Starting in 1973, Congress enacted laws providing certain protections to doctors and others who objected to performing abortions and certain other procedures.  Relevant for our purposes are the following:  (1) the Church Amendment; (2) the Coats-Snowe Amendment; (3) Medicaid and Medicare Advantage law; (4) the Weldon Amendment; and (5) the Patient and Affordable Care Act.  Since the new rule purports to interpret these statutes, let's review them.

### A.   Church Amendment (1973).

Senator Frank Church of Idaho will be remembered by many for his opposition to the Vietnam War, his hearings exposing abuse by CIA surveillance of American citizens, and his championing of wilderness and environmental causes.  For our immediate purposes, however, we remember him for the Church Amendment.

United States District Court

For the Northern District of California

Following *Roe v. Wade*, as stated, a Montana district court issued a temporary injunction requiring a Catholic hospital to allow its facilities to be used for sterilization, specifically, a tubal ligation procedure. *Taylor*, 369 F. Supp. at 948. Senator Church stated the purpose of his amendment was, among other things, to clarify the intent of Congress as to "physicians, nurses, or institutions" who don't perform "abortions or sterilization in religious affiliated hospitals where such operations are contrary to religious belief." 119 Cong. Rec. 9595–97.

The Church Amendment provided that the receipt of federal funds by any individual or entity did not authorize any court or public official to require such individual to perform or assist in the performance of any sterilization procedure or abortion contrary to his religion or conscience, nor to require such entity to make its facilities available for sterilization or abortion if such procedure was prohibited by the entity on the basis of religious or moral convictions. Entities receiving federal funds were barred from discriminating "in the employment, promotion, or termination of employment" of physicians or health care personnel as well as from discriminating "in the extension of staff or other privileges" to physicians or "health care personnel" based upon their conscientious refusal to perform or assist in the performance of those procedures. The amendment also provided that "[n]o individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7. The statute gave no delegation of authority to any agency to issue legislative rules (or even interpretive rules, for that matter).

**B.    Coats-Snowe Amendment (1996).**

Twenty-three years passed. No agency rule issued or was even proposed. In 1996, however, a new concern surfaced, namely that medical students felt coerced into learning how to perform abortions. Still, no agency acted — but Congress did act. A 1996 amendment drew sponsorship from Senators Olympia Snowe and Dan Coats. Until her recent retirement, Senator Snowe of Maine received notice for her finding bi-partisan ways forward through

3

United States District Court

For the Northern District of California

1    contentious issues.  Senator Dan Coats became known for sponsoring the "Don't Ask, Don't

2    Tell" policy of the early 1990s.  He later served as Director of National Intelligence from

3    March 2017 to August 2019.

4        The Coats-Snowe Amendment prohibited, among other things, government entities

5    receiving federal financial assistance from discriminating against any "health care entity" that

6    "refuses to undergo training in the performance of induced abortions, to require or provide such

7    training, to perform such abortions, or to provide referrals for such training or such abortions"

8    or refusing to make arrangements for those activities.  The amendment specifically defined the

9    term "health care entity" to include "an individual physician, a postgraduate physician training

10   program, and a participant in a program of training in the health professions."  42 U.S.C. § 238n.

11       The Amendment also required government entities receiving federal financial instance to

12   accredit health care entities "that would be accredited but for the accrediting agency's reliance

13   upon an accreditation standards that requires an entity to perform an induced abortion or require,

14   provide, or refer for training in the performance of induced abortions, or make arrangements for

15   such training."  The Amendment provided express rulemaking authority as to that provision

16   only.  *Id.* at § 238n(b)(1).

17                    **C.    Medicaid and Medicare Advantage (1997).**

18       The following year, in 1997, Congress passed the Balanced Budget Act, which changed

19   key components of Medicaid and introduced Medicare Advantage.  Of importance, the statute

20   stated that Medicaid-managed organizations and Medicare Advantage plans were not

21   required to "provide, reimburse for, or provide coverage of a counseling or referral service"

22   if the organization objected to the service on moral or religious grounds.  42 U.S.C.

23   §§ 1395w-22(j)(3)(B), 1396u-2(b)(3)(B).  The Social Security Act provided express rulemaking

24   authority to HHS to implement the Medicaid and Medicare Advantage provisions.  *Id.* at

25   §§ 1302(a); 1395w-26(b)(1).

26

27

28

4

**D.    Weldon Amendment (2004).**

In 2004 came the Weldon Amendment.  Representative Dave Weldon, a doctor, made headlines for legislation regarding home ownership affordability, vaccine safety, and the prevention of human cloning.

The Weldon Amendment provided that no federal funds "may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, *provide coverage of*, *or refer for abortions.*"  Importantly, it expressly defined the term "health care entity" for purposes of the Amendment to include "an individual physician or other *health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan*."  *See, e.g.*, Appropriations Act, Pub. L. No. 115-245, Div. B., § 507(d), 132 Stat. 2981, 3118 (2018) (emphasis added). This definition differed from the definition of the same phrase as used in the Coats-Snowe Amendment.  The Weldon Amendment was meant to protect "health care entities" from being forced by the government to provide, cover, refer, or pay for abortions.  HMOs and health insurance plans could not, under the amendment, be discriminated against with respect to federal funds on account of their refusal to cover abortions.

**E.    Patient Protection and Affordable Care Act (2010).**

Finally, in 2010 came the Patient Protection and Affordable Care Act with several new conscience provisions.  One such notable provision stated the federal government or any governmental agency that received federal financial assistance under the act "may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing."  42 U.S.C. § 18113.  For that section only, the Act defined "health care entity" in the same way as the Weldon Amendment, to include, "an individual physician or other health care professional, a hospital, a provider-sponsored organization,

United States District Court

For the Northern District of California

1    a health maintenance organization, a health insurance plan, or any other kind of health care

2    facility, organization, or plan." *Ibid.*

3        Another provision said that a State could prohibit abortion coverage in qualified health

4    care plans, and that a qualified health care plan could not discriminate against a health

5    care provider or entity that was unwilling to provide, pay for, provide coverage of, or refer for

6    abortions. *Id.* § 18023. A further provision allowed individuals to seek exemption based on,

7    among other things, their religion. *Id.* § 18081(b)(5)(A). The Act also provided HHS with

8    express rulemaking authority to implement the Act. *Id.* § 18041(a)(1).

9        **2.    THE HISTORY OF AGENCY RULES REGARDING THESE STATUTES.**

10       None of the foregoing statutes other than the Coats-Snowe Amendment, the

11   Medicare/Medicaid laws, and the Affordable Care Act expressly delegated rulemaking authority

12   to any agency. Even in those cases, the delegation remained limited. From 1973 until 2008, no

13   agency issued any rule of any type concerning any health care conscience statute.

14       **A.    2008 and 2011 Rules.**

15        In August 2008, however, HHS first proposed an interpretive rule for the enforcement

16   of the conscience statutes then in place. The comments in response to the proposed rule

17   expressed many of the same concerns as plaintiffs express in this instant action, stating, for

18   example, that the definitions of the terms "assist in the performance of" and "health care entity"

19   were too broad. Critics also worried that the proposal conflicted with Medicaid, Title X (which

20   required family planning projects to offer certain family planning services), and the Emergency

21   Medical Training and Active Labor Act (EMTALA) (which required certain hospitals to

22   stabilize or transfer patients in emergency situations). 42 U.S.C. §§ 300; 1395dd.

23       The 2008 rule defined many of the same statutory terms as does the 2019 rule at issue,

24   such as "assist in the performance" and "health care entity," to take only two examples. *See*

25   Ensuring That HHS Funds Do Not Support Coercive or Discriminatory Policies or Practices

26   in Violation of Federal Law, 73 Fed. Reg. at 78,082, 78,097 (Dec. 19, 2008). It ultimately

27   prohibited HHS fund recipients from discriminating against health care entities that did not

28   "provide, pay for, provide coverage of, or refer for abortions," and further required HHS fund

recipients to certify compliance with the rule.  For those that did not comply with the rule, HHS

stated it "intend[ed] to work with recipients . . . to ensure compliance with the requirements or

prohibitions promulgated in this regulation, and, if such assistance fails to achieve compliance,

the Department will consider all legal options, including termination of funding."  The rule

designated the Office of Civil Rights (OCR) to receive complaints of discrimination and

coercion based on the health care conscience protection statutes.  *Id.* at 78,074–79, 93.

Three months after the rule took effect, however, and with a different administration in

office, HHS proposed to rescind the rule in order to review the regulation and "ensure its

consistency with current Administration policy and to reevaluate the necessity for regulation."

74 Fed. Reg. 10,207 (Mar. 10, 2009).  HHS received over 300,000 comments in response.

Many of these comments expressed concern the 2008 rule "unacceptably impacted patient rights

and restricted access to health care and conflicted with federal law, state law, and other

guidelines addressing informed consent."  Regulation for the Enforcement of Federal Health

Care Provider Conscience Protection Laws, 76 Fed. Reg. 9968, 9971 (Feb. 23, 2011).  In 2011,

HHS rescinded in part and revised in part the 2008 rule.  Of importance, the 2011 rule rescinded

the definitions "because of concerns that they may have caused confusion regarding the scope of

the federal health care provider conscience protection statutes" and stated "individual

investigations will provide the best means of answering questions about the application of the

statutes in particular circumstances."  The rule also stated "the certification requirements in the

2008 Final Rule are unnecessary to ensure compliance with the federal health care provider

conscience protection statutes, and that the certification requirements created unnecessary

additional financial and administrative burdens on health care entities."  The rule further

designated the OCR to receive complaints of discrimination and coercion based on the

conscience protection statutes and to coordinate the handling of complaints with the HHS

funding components.  *Id*. at 9974.

### B.      The Instant Rule.

In May 2017, President Donald Trump issued an executive order instructing the Attorney

General to "issue guidance interpreting religious liberty protections in Federal law."  Promoting

United States District Court

For the Northern District of California

Free Speech and Religious Liberty, 82 Fed. Reg. 21,675 (May 4, 2017).  In October 2017, Attorney General Jeff Sessions issued a memorandum to "guide all administrative agencies and executive departments" in doing so.  Federal Law Protections for Religious Liberty Attorney General Memorandum (Oct. 6, 2017).  In January 2018, HHS proposed to resurrect most of the 2008 rule, stating that the 2011 rescission had "created confusion over what is and is not required under Federal conscience and anti-discrimination laws."  Protecting Statutory Conscience Rights in Health Care, 83 Fed. Reg. 3880 (Jan. 26, 2018).  HHS received over 242,000 comments in response.  Many comments expressed the same concerns as plaintiffs here, including among other things, that the rule would lead to a decrease in access to health care; that the proposed definitions for terms such as "health care entity," "referral or refer for," and "assist in the performance of" were too broad; and that the rule conflicted with laws such as EMTALA and Title X (*see, e.g.*, AR 006-58592, 008-187087, 008-187916, 008-191263).

In May 2019, HHS issued its final rule — the rule in suit.  Protecting Statutory Conscience Rights in Health Care, 84 Fed. Reg. 23,170 (May 21, 2019).  It defines various nouns, verbs, and phrases in the conscience statutes in an expansive way, as explained below, so as to inflate the scope of protections for conscientious objectors.  The rule also provides compliance and certification provisions that require covered entities to certify their compliance with federal conscience statutes, anti-discrimination laws, *and the rule itself*.  Covered entities that fail to abide by these requirements risk losing the *entirety* of their federal funding, not just categories of funding such as grants, loans, and insurance.

Plaintiff City and County of San Francisco filed the instant action, alleging the rule violated the Administrative Procedure Act (APA) and the Constitution.  *City and County of San Francisco v. Alex M. Azar II, et al.*, C 19-02405 WHA.  A few weeks later, plaintiff State of California filed an action making most of the same claims as San Francisco with an additional FOIA claim.  *State of California v. Alex M. Azar II, et al.*, C 19-02769 WHA.  A week later, plaintiffs County of Santa Clara and various health and LGBTQ organizations also filed an action challenging the rule, making the same claims.  *County of Santa Clara, et al., v. U.S. Dept. of Health and Human Services, et al.*, C 19-02916 WHA.  An order granted the parties'

United States District Court

For the Northern District of California

stipulated request to postpone the effective date of the rule until November 22, 2019, thus

obviating the need to consider any provisional relief.  Defendants now move to dismiss under

FRCP 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment.  Plaintiffs also move

for summary judgment (Dkt. Nos. 14, 66, 89, 136).  The Court appreciates the briefing and

argument by both sides and the notable contributions made by amici.

**ANALYSIS**

1.       **RULE 12(B)(1) MOTION TO DISMISS.**

Defendants raise two jurisdictional arguments under FRCP 12(b)(1).  *First*, they argue

plaintiffs' spending clause and establishment clause claims are not ripe for review because

they have not identified any specific enforcement actions against them.  *Second*, they argue the

physician plaintiffs in *Santa Clara* lack standing to bring free speech, equal protection, and due

process claims on behalf of their patients.

**A.       Plaintiffs' Spending Clause and Establishment
Clause Claims Are Ripe for Review.**

Determining whether an action is ripe for judicial review requires an evaluation of:

(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial

intervention would inappropriately interfere with further administrative action; and (3) whether

the courts would benefit from further factual development of the issues presented.  *Ohio Forestry

Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).  Hardship can occur when the impact of the

regulation can be felt immediately by those subject to it in conducting their day-to-day affairs.

*Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967).  Specifically, "where a regulation

requires an immediate and significant change in the plaintiffs' conduct of their affairs with

serious penalties attached to noncompliance," the claims are ripe for review.  *Abbott Labs. v.

Gardner*, 387 U.S. 136, 153 (1967), *overruled on other grounds by Califano v. Sanders*,

430 U.S. 99, 105 (1977).

Defendants argue plaintiffs' establishment clause and spending clause claims are not ripe

because the claims rest on contingent future events.  In particular, they contend that plaintiffs

have only provided speculative scenarios in which the two claims can be evaluated.  Not so.

Regardless of how the rule is interpreted, plaintiffs would need to conduct extensive inquiries

9

into hospitals and personnel to determine their compliance with not only the underlying statutes, but the rule itself.  Plaintiffs have further provided examples of numerous hospital policies which contain provisions regarding discrimination that may need to be overhauled under the final rule. For example, Zuckerberg San Francisco General Hospital policies state (*State of California*, Dkt. No. 69 ¶ 8):

> In the event a staff member feels reluctant to participate in an aspect of patient care because the patient's condition, treatment plan, or physician's orders are in conflict with the staff member's religious beliefs, cultural values, or ethics, the staff member's written request for accommodation will be considered if the request does not negatively affect the quality of patient's care.

Such policies would need to be rewritten and alternative business practices or procedures created to comply with the rule while also ensuring patients receive adequate care.  Furthermore, if plaintiffs alternatively choose not to comply with the rule, they would need to prepare for the contingency of the termination of all federal funding.  Although defendants have stated that the extent of enforcement in regard to funding is now unknown given the postponement of the rule, this does not change the fact that the whole point of the rule is to "clarify" the statutes in a way that will impose changes to comply.  Accordingly, defendants' motion to dismiss plaintiffs' spending clause and establishment clause claims is **DENIED**.

## B.    The *Santa Clara* Physician Plaintiffs Have Standing.

Defendants challenge the standing of the *Santa Clara* physician plaintiffs in raising free speech, equal protection, and due process claims on behalf of their LGBTQ and abortion-seeking patients.  Although plaintiffs generally must assert their own legal rights and interests, a third party may have standing depending on the relationship of the litigant to the person whose right he or she seeks to assert and the ability of the third party to assert his or her own rights. *Singleton v. Wulff*, 428 U.S. 106, 114–16 (1976).

Defendants attempt to distinguish *Singleton* from the instant case by stating its holding only applies to physicians who perform nonmedically indicated abortions and are asserting rights on behalf of pregnant women.  Not so.  *Singleton*'s holding is broader, as the Supreme Court found that the physicians had third party standing given the *confidential nature of the relationship between physicians and women seeking the abortion* as well as the obstacles women

have in asserting their right to an abortion.  In particular, women generally cannot safely secure

abortions without the aid of physicians and "the constitutionally protected abortion decision is

one in which the physician is intimately involved."  *Singleton,* 428 U.S. at 115–17.

In the instant case, physicians are similarly asserting claims on behalf of women seeking

abortions and LGBTQ patients.  Doctors and their patients have a confidential relationship,

especially when it comes to asserting rights related to invasive procedures and treatments.

Furthermore, most of the medical procedures at issue here such as abortions, gender-affirming

surgery, and HIV treatments cannot be safely secured without the aid of a physician.  The rights

of the individual physician plaintiffs and their patients here are thus closely intertwined.

Because the physician plaintiffs in *Santa Clara* have standing, defendants' motion to dismiss

the *Santa Clara* physician plaintiffs' free speech, equal protection, and due process claims is

**DENIED**.

### 2.    RULES 12(B)(6) AND 56 — THE APA CLAIM.

On the merits, this order holds that the new rule sets forth new definitions of statutory

terms that conflict with the statutes themselves — expansive definitions that would upset the

balance drawn by Congress between protecting conscientious objectors versus facilitating the

uninterrupted provision of health care to Americans.

With the minor exceptions noted below, the new rule is purely an interpretive rule,

not a legislative rule.  An agency, of course, must interpret a statute under its care.  But an

interpretation, even if cast in the form of a regulation, is nothing more than that —

an interpretation.  The statute itself is what has the force of law, not the interpretation.

No interpretation can add or subtract from the actual scope of the statute itself.  If the agency

misconstrues a statute, then the statute controls, not the interpretation.

The guiding principle, therefore, is that no interpretation, not even an agency

interpretation, can add or subtract from what the statute itself specifies.  In a close case of

statutory construction, we might defer to the agency's interpretation.  But otherwise, we must

remain faithful to the statutes enacted by Congress.  And while a legislative rule may add to a

statute, it cannot subtract from a statute.  Fidelity to the statute is paramount.

United States District Court
For the Northern District of California

1    In reading the statutes in question, the Court sees that Congress tried to strike a balance

2    between two competing considerations.  One consideration was recognition that, due to religious

3    or ethical beliefs, some doctors, nurses, and hospitals, among others, wanted no part in the

4    performing of abortions and sterilizations, among other medical procedures, and Congress

5    wanted to protect them from discrimination for their refusal to perform them.  The countervailing

6    consideration was recognition of the need to preserve the effective delivery of health care to

7    Americans, including to those seeking, for example, abortions and sterilizations.  Every doctor

8    or nurse, for example, who bowed out of a procedure for religious or ethical reasons became one

9    more doctor or nurse whose shifts had to be covered by someone else, a burden on the healthcare

10    system.  Congress struck a balance between these two opposing considerations.

11    In reading the rule in question, the Court sees a persistent and pronounced redefinition

12    of statutory terms that significantly expands the scope of protected conscientious objections.

13    As laudable as that sounds, however, it would come at a cost — a burden on the effective

14    delivery of health care to Americans in derogation of the actual balance struck by Congress.

15    **A.    Definitions.**

16    The new rule includes five columns (in the Federal Register) of new definitions of

17    statutory terms.  These definitions, as will be seen, make the mischief.  Then follow many

18    columns of restatements of the statutes in question, which restatements remain largely true to the

19    words used by Congress (but whose scope becomes expanded by the definitions).  Finally come

20    concluding columns imposing "assurance" and "compliance" certificate obligations on

21    applicants for federal funds.  This order will now turn to the definitions, the heart of the problem.

22    *(1)    "Assist in the Performance of."*

23    The reader will recall that the Church Amendment protected not only those individuals

24    who "perform" abortions and sterilizations but also those individuals who "assist in the

25    performance" of abortions and sterilizations.  Only the Church Amendment used "assist in

26    the performance of," and it did so as follows:

> The receipt of any grant, contract, loan, or loan guarantee under
> the Public Health Service Act, the Community Mental Health
> Centers Act, or the Developmental Disabilities Services and
> Facilities Construction Act by any individual or entity does not

12

United States District Court
For the Northern District of California

authorize any court or any public official or other public authority to require (1) such individual *to perform or assist in the performance of* any sterilization procedure or abortion if his *performance or assistance in the performance of* such procedure or abortion would be contrary to his religious beliefs or moral convictions; [. . .]

42 U.S.C. § 300a-7 (emphasis added).

The final rule now defines "assist in the performance" as:

[T]o take an action that has a specific, reasonable, and articulable connection to furthering a procedure or a part of a health service program or research activity undertaken by or with another person or entity. This may include counseling, referral, training, or otherwise making arrangements for the procedure or a part of a health service program or research activity, depending on whether aid is provided by such actions.

"Assist in the performance" was originally intended to cover *only those individuals in the operating room who actually assisted the physician in carrying out the abortion or sterilization procedure*. This is clear from the colloquy between Senator Russell Long and Senator Church on the floor prior to the passage of the amendment:

Mr. Long: The thought occurs to me that it would seem reasonable to say that where one seeks a sterilization procedure or an abortion, it could not be performed because there might be a nurse or an attendant somewhere in the hospital who objected to it. If it was not a matter of concern to that individual, it seems to me that that is getting to be a little far-fetched, that is, that someone who had nothing to do with the matter *and was not involved in it one way or the other, just someone who happened to be working in a hospital, and was not involved in an abortion or a sterilization procedure*, could veto the rights of a physician and the rights of patients to have a procedure which the Supreme Court has upheld.

Mr. Church: Let me make clear, Mr. President, that such is not my intention. I understand the basis for the expression of concern on the part of the Senator from Louisiana, but the words on line 19, ". . . of such physician or other health care personnel, . . ." relate back to the same words used on lines 12 and 13 and must be read in context with those words.

Mr. Long: If I understand what the Senator is saying, he is saying that a nurse or an attendant who has religious feelings contrary to sterilization or abortion should not be required and would not be required by any Federal activity to participate in any such procedure

13

United States District Court

For the Northern District of California

to which they hold strong moral or religious
convictions to the contrary.

Mr. Church:  That is correct.

Mr. Long:  So that this would not, in effect, say that one who
sought such an operation would be denied it because
someone working in the hospital objected *who had
no responsibility, directly or indirectly with regard
to the performance of that procedure.  It would only
be that one who was involved in performing the
operation or in assisting to perform the operation
could not be required to participate when he or she
held convictions against that type of procedure.*

Mr. Church:  *The Senator is correct.*  The amendment is meant
to give protection to the physicians, to the nurses,
to the hospitals themselves, if they are religious
affiliated institutions.  So the fact Federal funds
may have been extended will not be used as an
excuse for requiring physicians, nurses, or
institutions to perform abortions or sterilizations that
are contrary to their religious precepts.  That is the
objective of the amendment. *There is no intention
here to permit a frivolous objection from someone
unconnected with the procedure to be the basis for a
refusal to perform what would otherwise be a legal
operation.*

119 Cong. Rec. 9597 (1973) (emphasis added).  Accordingly, the phrase "assist in the

performance" refers only to the assistance provided by nurses or other medical professionals

involved in the procedure itself in the operating room, not the ambulance driver or anyone else

outside the time and place of the procedure itself.

HHS nevertheless insists that "driving a person to a hospital or clinic for a scheduled

abortion could constitute 'assisting in the performance of' an abortion, as would physically

delivering drugs for inducing abortion."  84 Fed. Reg. 23,188 (May 21, 2019).  At recent oral

argument for a similar challenge to the same rule in the United States District Court for the

Southern District of New York, District Judge Paul Engelmayer presented counsel for HHS with

the following situation:

A pregnant woman takes an ambulance across Central Park to
Mt. Sinai Hospital and, midway through, from conversation with
the ambulance driver, it becomes clear that she is headed there to
terminate an ectopic pregnancy.  The driver tells her to get out in
the middle of the park, and the employer fires the ambulance
driver for that.  Is the ambulance driver assisting in the

14

United States District Court

For the Northern District of California

> performance of the procedure if the ambulance driver takes her to the hospital?

In response, government counsel insisted "[t]he rule protects an ambulance driver's ability not to assist in the performance of a procedure to which the driver has an objection" (*State of California*, Dkt. No. 133, Exh. A at 116:21–25; 117:1–18). During oral argument in the instant action, HHS again insisted that ambulance drivers should and would be covered (*Id.*, Dkt. No. 139 at 48–52).

Under a proper reading of the Church Amendment, however, no driver or EMT could ever qualify, under any circumstance, as an individual who "assists in the performance of" an abortion or sterilization. The colloquy between Senators Church and Long demonstrated that the Church Amendment was meant to protect those who would be involved in carrying out the procedure itself, such as physicians, nurses assisting the physicians, and others in the operating room necessary for the procedure itself. An ambulance driver assists in no such way. Ambulance drivers and EMTs aboard ambulances transport and stabilize. Accordingly, neither an ambulance driver nor an EMT "assist in the performance" and thus fall outside the Church Amendment.

Also covered under HHS's interpretation of the rule would be schedulers and housekeeping staff. HHS has stated "[s]cheduling an abortion or preparing a room and the instruments for an abortion are necessary parts of the process of providing an abortion, and it is reasonable to consider performing these actions as constituting 'assistance.'" 84 Fed. Reg. 23,186–87 (May 21, 2019). Under the rule, a clerk scheduling surgeries for an operating room could refuse to reserve slots for abortions and sterilizations. So could an employee who merely sterilizes and places surgical instruments or ensures that the supply cabinets in the operating room are fully stocked in preparation for an abortion. For the reasons already stated, the Church Amendment was never intended to apply to those who have no role in the actual performance of the abortion or sterilization. Neither those who schedule abortions nor those who prepare an operating room assist in the performance of such a procedure under the Church Amendment.

HHS also states it disagrees with any interpretation of "assisting in the performance" that excludes pre- and post-operative support to an abortion patient. *Id.* at 23,187. But Senators

15

United States District Court

For the Northern District of California

1   Long and Church agreed that it would be far-fetched for the amendment to cover situations

2   in which "one seeks a sterilization procedure or an abortion, [and] it could not be performed

3   because there might be a nurse or an attendant somewhere in the hospital who objected to it."

4   119 Cong. Rec. 9597 (1973).  Pre- and post-op tasks include monitoring and ensuring that a

5   patient is stable and/or recovering following a procedure such as taking vitals and placing an

6   intravenous line — tasks that are generic to surgeries in general, not specific to abortions or

7   sterilization.[1]

8                               ***(2)      "Health Care Entity" For Purposes
                                        of the Coats-Snowe Amendment.***

9

10          The reader will recall that the Coats-Snowe Amendment protected "health care

11   entities" that refused to undergo or provide training for abortions against discrimination.

12   The Coats-Snowe Amendment defined "health care entity" as including "an individual

13   physician, a postgraduate physician training program, and a participant in a program of training

14   in the health professions," meaning, in short, doctors, residency programs, and medical students

15   or residents.  42 U.S.C. 238n(c)(2).  The Coats-Snowe Amendment followed a new standard by

16   the Accrediting Council on Graduate Medical Education "indicating that failure to provide

17   training for induced abortions could lead to loss of accreditation" for hospitals and training

18   programs.  The purpose of the amendment was thus to (1) ensure medical training programs

19   such as schools and residencies were not required to provide abortion training in order to be

20   accredited, and (2) extend conscience protections to students and faculty in the context of

21   training for abortions as well as to extend the protection to state schools (not just religious

22   schools).  142 Cong. Rec. 2264–65 (1996).

23          The final rule, however, redefines "health care entity" for purposes of the Coats-Snowe

24   Amendment as:

25                  (1)  For purposes of the Coats-Snowe Amendment (42 U.S.C.
                    238n) and the subsections of this part implementing that law
26                  (§ 88.3(b)), an individual physician or other *health care*

27   ─────────────────────

28          [1] This order recognizes that the physical act of removing and disposing a fetus during and immediately
     following an abortion would be "assisting in its performance."  The definition proposed by HHS, however, goes
     well beyond such assistance and cannot be squared with the statute itself.

16

*professional*, including *a pharmacist*; *health care personnel*;
a participant in a program of training in the health professions;
*an applicant for training or study in the health professions*; a
postgraduate physician training program; *a hospital*; *a medical
laboratory*; *an entity engaging in biomedical or behavioral
research*; *a pharmacy*; *or any other health care provider or
health care facility*.  As applicable, components of State or
local governments may be health care entities under the
Coats-Snowe Amendment.

84 Fed. Reg. 23,264 (May 21, 2019).

The problem with the redefinition in the rule is that it adds several new persons and entities beyond those in the actual statute (as italicized above).  To be precise, the following did not appear in the Coats-Snowe Amendment (or its legislative history) but now surface in the redefinition of "health care entity":

health care professional, a pharmacist, health care personnel, an
applicant for training or study in the health professions, a hospital,
medical laboratory, an entity engaging in biomedical or behavioral
research, a pharmacy, or any other health care provider or health
care facility.

To be sure, some of these entities appeared in *other* conscience statutes.  For example, the Church Amendment protected "applicants for training or study in the health professions." The Church Amendment also referenced entities engaging in biomedical or behavior research, but only as entities *that were prohibited from discriminating*.  Under the final rule, however, they have been moved to the other side of the ledger — as entities protected *from discrimination* and, equally problematic, imported from a different statute.

Other additions, however, never appeared in any conscience statute.  Let's start with pharmacists and pharmacies.  The rule states that "[a] pharmacy is a health care entity, considering the ordinary meaning of that term, because it provides pharmaceuticals and information, which are health care items and services."  84 Fed. Reg. 23,196 (May 21, 2019). Nowhere in the text or legislative history of the Coats-Snowe Amendment, however, is a "health care entity" defined as one that provides health care items and services.  Rather, when it comes to individuals (as opposed to organizations), the statute consistently includes only those engaging in or needing to engage in the actual performance of the procedure in question or assisting in the procedure, such as doctors and nurses.

The Coats-Snowe Amendment was aimed at protecting doctors, residents, and medical students in the context of training.  Pharmacists, like ambulance drivers, don't fit. A pharmacist's only possible role in an abortion or sterilization procedure would be dispensing advance medication to facilitate the procedure or post-procedure medication to stabilize or heal the patient, such as pain medication.  Dispensing such medication, however, is not specific to the performance of the procedure itself.

"Medical laboratories" is another term added into the new definition that did not appear in another statute.  The Coats-Snowe Amendment, to repeat, expressly defined "health care entity" as "an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions."  Medical laboratories run tests that assist in diagnosing or in analyzing the outcome of certain procedures.  They do not fit the statutory definition.  Medical laboratories are thus not health care entities as defined or contemplated by the Coats-Snowe Amendment and the final rule was wrong to include them.

HHS has made many other additions in defining the term and justified doing so by stating that the Coats-Snowe Amendment used the word "include."  It is, of course, true that the statutory definition used the verb "include," and the Supreme Court has held that the word "include" can signal that the list that follows is meant to be illustrative rather than exhaustive. *Samantar v. Yousuf*, 560 U.S. 305, 317 (2010).  But when interpreting Congress's intent or administrative regulations, the word "include" is nonetheless bounded by the intent expressed in the legislative history.  *See United States v. $215,587.22 in U.S. Currency Seized from Bank Account No. 100606401387436 held in the Name of JJ Szlavik Companies, Inc. at Citizens Bank*, 306 F. Supp. 3d 213, 218 (D.D.C. 2018).  In other words, even when the listed terms in an inclusive definition are illustrative, a list still cannot be inflated with terms lacking the defining essence of those in the list, as has occurred here.  *See Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923).

### (3) *"Health Care Entity" For Purposes of the Weldon Amendment and the Affordable Care Act.*

The Weldon Amendment itself provided its own statutory definition of "health care entity," stating "[i]n this subsection, the term 'health care entity' includes an individual

physician or other health care professional, a hospital, a provider-sponsored organization, a

health maintenance organization, a health insurance plan, or any other kind of health care

facility, organization or plan." Pub. L. No. 1154-245, Div. B., § 507(d)(2), 132 Stat. 2981, 3118

(2018). Note that this definition differed from the statutory definition of the same term in the

Coats-Snowe Amendment. The final rule, however, redefines "health care entity" for purposes

of the Weldon Amendment (and for purposes of the Affordable Care Act, discussed hereafter)

as:

> (2) For purposes of the Weldon Amendment (e.g., Department of
> Defense and Labor, Health and Human Services, and Education
> Appropriations Act, 2019, and Continuing Appropriations Act,
> 2019, Pub. L. 115–245, Div. B., sec. 507(d), 132 Stat. 2981,
> 3118 (Sept. 28, 2018)), Patient Protection and Affordable Care
> Act section 1553 (42 U.S.C. 18113), and to sections of this part
> implementing those laws (§ 88.3(c) and (e)), an individual
> physician or other health care professional, including *a
> pharmacist; health care personnel; a participant in a program of
> training in the health professions; an applicant for training or
> study in the health professions; a postgraduate physician training
> program; a hospital; a medical laboratory; an entity engaging in
> biomedical or behavioral research; a pharmacy*; a provider-
> sponsored organization; a health maintenance organization; *a
> health insurance issuer*; a health insurance plan (including group
> or individual plans); *a plan sponsor or third-party administrator*;
> or any other kind of health care organization, facility, or plan.
> As applicable, components of State or local governments may be
> health care entities under the Weldon Amendment and Patient
> Protection and Affordable Care Act section 1553.

84 Fed. Reg. 23,264 (May 21, 2019). The following individuals and organizations did not

appear in the Weldon Amendment (nor in its legislative history), but now appear as part of the

expanded definition of "health care entity" for purposes of the Weldon Amendment:

> pharmacist, health care personnel, a participant in a program of
> training in the health professions, an applicant for training or study
> in the health professions, a postgraduate physician training
> program, a medical laboratory, an entity engaging in biomedical
> or behavioral research; a pharmacy, a health insurance issuer, and
> a plan sponsor or third-party administrator.

In presenting the Amendment, Representative Weldon stated the following:

> The reason I sought to include this provision in the bill is my
> experience as a physician, and I still see patients, is that the
> majority of nurses, technicians and doctors who claim to be
> pro-choice who claim to support *Roe v. Wade* always say to me
> that they would never want to participate in an abortion, perform
> an abortion, or be affiliated with doing an abortion. This provision

United States District Court
For the Northern District of California

19

is meant to protect health care entities from discrimination because they choose not to provide abortion services.

In addressing Representative Zoe Lofgren's concern that the "sweeping new legislation" would allow "any individual physician, health care professional, hospital, HMO, health insurance plan or any other kind of health care facility, organization, or plan from providing, paying for, or even referring a patient for abortion services," Representative Weldon stated that, "[t]his provision is intended to protect the decisions of physicians, nurses, clinics, hospitals, medical centers, and even health insurance providers from being forced by the government to provide, refer, or pay for abortions." 150 Cong. Rec. 25,044–45 (2004).

As with the Coats-Snowe Amendment, the redefinition for purposes of the Weldon Amendment adds a host of individuals and organizations under "health care entities." Some of these terms come from conscience provisions in other statutes and others do not. Regardless, none of these additions was defined or contemplated in the underlying statute. For example, a pharmacist has again been included. As Representative Weldon stated, however, the protection against discrimination was only extended to "physicians, nurses, clinics, hospitals, medical centers, and even health insurance providers." Unlike those listed individuals and entities, a pharmacist does not play a role specific to the performance of an abortion or sterilization procedure. The addition of individuals such as pharmacists and other such organizations like pharmacies fall outside the intent of the underlying statute and the final rule is wrong to include them.

*          *          *

The Affordable Care Act protected health care entities from discrimination in the context of assisted suicides. The ACA defined the term "health care entity" in exactly the same way as the Weldon Amendment. The same entities added in by the new rule for the Weldon Amendment was also added in for purposes of the ACA. Nonetheless, the definition of "health care entity" under the ACA presents a closer question, given the fact that the ACA applied to health care entities in the context of assisted suicides and not abortions and given that, unlike the other statutes, the ACA did delegate legislative rulemaking power to the agency. We can accept that a pharmacy is a "health care entity" for purposes of the ACA. Although

20

United States District Court

For the Northern District of California

pharmacists do not play a significant role in treatment in the context of abortions and sterilizations, they do in assisted suicides.  For example, one method of assisted suicide requires patients to ingest lethal amounts of barbital capsules, and a pharmacist could be required to dispense such medication and ultimately cause the patient's death.  In that context, it is clear that the pharmacist would have a role in the actual treatment of the patient.  This order is thus unable to find a clear conflict of the definition of "health care entity" for purposes of the ACA in the challenged rule versus the definition in the ACA.

### (4)     *"Entity."*

At this point, let's return briefly to the Church Amendment.  Although it did not use the term "health care entity," it did use the term "entity."  It also used the term "individual."  It consistently used those terms so as to distinguish "entities" from "individuals," the former being organizations and the latter being natural persons.  This is quite evident from a simple reading of the statute.

The final rule, however, merges the two.  Specifically, it defines "entity" to include, among others, "*a 'person' as defined in 1 U.S.C. 1*."  In turn, Section 1 defines "person" to include:  "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, *as well as individuals*" (emphasis added).  Therefore, the rule redefines "entity" to include "individual," exactly what the Church Amendment avoided.  The new rule was wrong to do so.

### (5)     *"Discriminate" or "Discrimination."*

The final rule defines "discriminate or discrimination" to include:

> (1)  To withhold, reduce, exclude from, terminate, restrict, or make unavailable or deny any grant, contract, subcontract, cooperative agreement, loan, license, certification, accreditation, employment, title, or other similar instrument, position, or status;
>
> (2)  To withhold, reduce, exclude from, terminate, restrict, or make unavailable or deny any benefit or privilege or impose any penalty; or
>
> (3)  To utilize any criterion, method of administration, or site selection, including the enactment, application, or enforcement of laws, regulations, policies, or procedures directly or through contractual or other arrangements, that subjects individuals or entities protected under this part to any adverse treatment with

respect to individuals, entities, or conduct protected under this part on grounds prohibited under an applicable statute encompassed by this part.

(4)  Notwithstanding paragraphs (1) through (3) of this definition, an entity subject to *any prohibition* in this part shall not be regarded as having engaged in discrimination against a protected entity where the entity offers and the protected entity voluntarily accepts an effective accommodation for the exercise of such protected entity's protected conduct, religious beliefs, or moral convictions.  In determining whether any entity has engaged in discriminatory action with respect to any complaint or compliance review under this part, OCR will take into account the degree to which an entity had implemented policies to provide effective accommodations for the exercise of protected conduct, religious beliefs, or moral convictions under this part and whether or not the entity took any adverse action against a protected entity on the basis of protected conduct, beliefs, or convictions before the provision of any accommodation.

(5)  Notwithstanding paragraphs (1) through (3) of this definition, an entity subject to *any prohibition* in this part may require a protected entity to inform it of objections to performing, referring for, participating in, or assisting in the performance of specific procedures programs, research, counseling, or treatments, but only to the extent that there is a reasonable likelihood that the protected entity may be asked in good faith to perform, refer for, participate in, or assist in the performance of, any act or conduct just described.  *Such inquiry may only occur after the hiring of, contracting with, or awarding of a grant or benefit to a protected entity, and once per calendar year thereafter, unless supported by a persuasive justification.*

(6)  The taking of steps by an entity subject *to prohibitions* in this part to use alternate staff or methods to provide or further any objected-to conduct identified in paragraph (5) of this definition would not, by itself, constitute discrimination or a prohibited referral, if such entity does not require any additional action by, or does not take any adverse action against, the objecting protected entity (including individuals or health care entities), and if such methods do not exclude protected entities from fields of practice on the basis of their protected objections.  Entities subject to prohibitions in this part may also inform the public of the availability of alternate staff or methods to provide or further the objected-to conduct, but such entity may not do so in a manner that constitutes adverse or retaliatory action against an objecting entity.

84 Fed. Reg. 23,263 (May 21, 2019).  The problematic part of the new rule is its restriction on inquiry into conscientious objections during the hiring process (italicized above), something none of the underlying statutes expressly barred.

The Church Amendment, for example, provided that certain entities could not "discriminate in the employment, promotion, or termination of employment of any physician or

United States District Court

For the Northern District of California

1  other health care personnel" or "discriminate in the extension of staff or other privileges to any

2  physician or other health care personnel," 42 U.S.C. § 300a-7(c), but nowhere did it expressly

3  bar inquiry into any conscientious objections in the hiring process.

4       Plaintiffs attack the new definition because it does not include an "undue hardship"

5  exception. To be clear, however, no federal conscience statute ever defined "discriminate" or

6  "discrimination," ever referred to Title VII, or itself provided any undue hardship exception.

7  At first blush, therefore, it is a bit hard to grasp plaintiffs' grievance.

8       Plaintiffs showcase a Florida case wherein a pro-life nurse applied for employment at a

9  Title X health center. She applied for a position as an antepartum, laborist, postpartum, and

10  preventative care nurse. *Hellwege v. Tampa Family Health Centers*, 103 F. Supp. 3d 1303, 1306

11  (M.D. Fla. 2015). If the health center had not been able to inquire about any ethical objections

12  she had to doing those jobs, it is possible she could have been staffed on an abortion procedure

13  and only learned of her objection after she was on the job. Surely, the employer in such

14  circumstance can ask if the applicant would have any conscience objection to doing the very

15  job at issue. The district judge in *Hellwege* did not reach this issue, as she found the Church

16  Amendment did not provide a private right of action. But scenarios like this could jeopardize

17  federal funding under the challenged rule.

18       Plaintiffs are correct that Title VII, 42 U.S.C. § 2000e–2(a), provides protection for

19  applicants of employment against discrimination based on their religious beliefs, yet provides

20  an undue hardship exception. Specifically, Title VII defines the term "religion" to include "all

21  aspects of religious observance and practice, as well as belief, unless an employer demonstrates

22  that he is unable to reasonably accommodate an employee's or prospective employee's religious

23  observance or practice without undue hardship on the conduct of the employer's business." *Id.*

24  at § 2000e(j). The Supreme Court has held that an undue hardship is one where an

25  accommodation would have "more than a de minimis cost." *Trans World Airlines, Inc. v.*

26  *Hardison*, 432 U.S. 63, 84 (1977).

27       In sum, Title VII allows an employer to inquire about religious beliefs that might impose

28  a hardship on the employer and allows the employer to reject an applicant whose religious

practices cannot be reasonably accommodated.  The question here is whether the Title VII scheme should be read into the Church Amendment (and any other conscience statutes covering applicants for employment).  After hewing to the words actually used in the Church Amendment (as plaintiffs themselves have argued), it would be ironic to veer from the actual text of the Church Amendment and to read concepts into it from the Civil Rights Act.  But it's unnecessary to decide that point.  Note well that the new rule includes an exception for "persuasive justification," meaning pre-employment inquiries can be made and applicants rejected when supported by a "persuasive justification."  Although this term is not further defined by the rule, this order expects that any undue hardships would supply persuasive justification.  Therefore, this order will not criticize the rule based on its definition of "discriminate" or "discrimination."

### *(6)*      *"Referral" or "Refer for."*

The final rule defines "referral" or "refer for" to include:

> [T]he provision of information in oral, written, or electronic form (including names, addresses, phone numbers, email or web addresses, directions, instructions, descriptions, or other information resources), where the purpose or reasonably foreseeable outcome of provision of the information is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure.

84 Fed. Reg. 23,264 (May 21, 2019).

The Church Amendment only addressed the performance and assistance in the performance of abortions, not referrals.  The other conscience statutes, however, did use the terms "referral" or "refer for."  The Coats-Snowe Amendment applied to health care entities that chose not to train "in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide *referrals for* such training or such abortions." 42 U.S.C. §238n(a)(1) (emphasis added).  The Medicaid and Medicare laws stated that Medicaid-managed organizations and Medicare Advantage plans were not required to "provide, reimburse for, or provide coverage of a counseling or *referral service*" if the organization objected to the service on moral or religious grounds.  42 U.S.C. §§ 1395w-22(j)(3)(B), 1396u–2(b)(3)(B) (emphasis added).  The Affordable Care Act prohibited qualified health care plans from discriminating against "any individual health care provider or health care facility

**United States District Court**
For the Northern District of California

24

United States District Court
For the Northern District of California

because of its unwillingness to provide, pay for, provide coverage of, or *refer for* abortions."
*Id.* at § 18023(b)(4) (emphasis added).  The Weldon Amendment applied to health care entities
that do not "pay for, provide coverage of, or *refer for*" abortions.  Pub. L. No. 115-245, Div. B
§ 507 (d), 132 Stat. 2981, 3118 (2018) (emphasis added).

The term was not defined nor addressed in the legislative history of any of the conscience
statutes.  However, the legislative history of at least the Weldon Amendment provided some
guidance.  In explaining his purpose, Representative Weldon stated:

> This provision is intended to protect the decisions of physicians,
> nurses, clinics, hospitals, medical centers, and even health
> insurance providers from being forced by the government to
> provide, *refer,* or pay for abortions.

> *                    *                    *

> This provision only applies to health care entities that refuse to
> provide abortion services.  Furthermore, the provision only affects
> instances when a government requires that a health care entity
> provide abortion services.  Therefore, contrary to what has been
> said, this provision will not affect access to abortion, *the provision
> of abortion-related information* or services by willing providers or
> the ability of States to fulfill Federal Medicaid legislation.

150 Cong. Rec. 25,044–45(2004) (emphasis added).

Therefore, Representative Weldon used the term "refer for" as separate from the
provision of information, and further explicitly clarified that the Amendment was not meant to
apply to the provision of abortion-related information.

Under the rule, however, the provision of any information by a "health care entity"
that could reasonably lead to a patient obtaining the procedure at issue would be considered a
"referral."  This means, for example, that an entity could lose all of its HHS funding if it fired a
hospital front-desk employee for refusing to tell a woman seeking an emergency abortion for an
ectopic pregnancy which floor she needed to go to for her procedure.

In justifying the need for this definition, HHS cites to *National Institute of Family and
Life Advocates v. Becerra* (*NIFLA*), a decision that addresses only the First Amendment
concerns in providing information regarding abortions to patients.  138 S. Ct. 2361 (2018).
Specifically in *NIFLA*, California enacted the FACT Act, which, in relevant part, required
licensed clinics that offered pregnancy-related services to provide a government-drafted script

25

about the availability of state-sponsored services, including abortions. *Id.* at 2371.  Although the Supreme Court found such provision of information to violate the First Amendment, it did not speak to whether the government-drafted script constituted a "referral" within the meaning of any conscience statute. *Id.* at 2365.

Instead, as to the Weldon Amendment at least, the legislative history is more instructive in determining whether the definition in the rule is appropriate.  As quoted above, Representative Weldon explicitly stated his amendment was not meant to cover the provision of abortion-related information even though the rule covers exactly such provision of information (and more). Additionally, the Weldon Amendment used the term "referral" versus the general provision of information as separate things.  This distinct use indicates that "referrals" are meant to cover narrower circumstances than the general provision of information.

The text and legislative histories of the remaining statutes do not provide any guidance regarding how "referral" or "refer for" should be defined.  The use of the terms in the medical profession, however, does provides some guidance.  In particular, medical professionals use the word "referral" as a term of art that ordinarily means a request from one physician to another to assume responsibility of a patient's specified problems.  *See, e.g.*, American Academy of Family Physicians Clinical Policies (2019);[2] 32 C.F.R 199.2.[3]  In contrast, the informal provision of general information such as emails, names, and directions are simply recommendations.  The definition of the term "referral" in the rule here thus goes beyond the meaning of the term as understood by the very industry HHS purports it is trying to protect.

### 3. INTERPRETIVE RULES VS. LEGISLATIVE RULES.

HHS claims that it has authority to promulgate a substantive, legislative rule, not a mere interpretive rule.  But there is no delegation of authority, either explicit or implicit, in any of the underlying statutes to do so except in the limited instances noted above.  An interpretive rule can

---

[2] "A referral is a request from one physician to another to assume responsibility for management of one or more of a patient's specified problems."

[3] In the context of the Civilian Health and Medical Program of Uniformed Services (CHAMPUS), a *referral* relationship exists when a CHAMPUS beneficiary is sent, directed, assigned or influenced to use a specific CHAMPUS-authorized provider, or a specific individual or entity eligible to be a CHAMPUS-authorized provider.

United States District Court

For the Northern District of California

never add to or subtract from a statute itself.  A legislative rule can never subtract from a statute, though one can add to it if the addition falls within the delegation authority.  No rule of either type can ever conflict with the statute itself.  As shown above, the new definitions conflict with the underlying statutes in significant ways.

### A.      Explicit Rulemaking Authority.

Nothing in the Church or Weldon amendments provided that HHS could promulgate rules.  Furthermore, the Coats-Snowe Amendment, Affordable Care Act and Medicare and Medicaid statutes cited by defendants conferred upon HHS authority to make and publish regulations only to a limited extent.  For example, Section 1302 of Title 42 of the United States Code granted the Secretary explicit authority to publish rules regarding the impact of Medicare and Medicaid on small rural hospitals.  Section 18113 furthermore explicitly designated HHS to receive complaints of discrimination based on the statute prohibiting discrimination on performing assisted suicides.  HHS, of course, has rulemaking authority to implement the ACA and Medicare and Medicaid programs as well as the applicable conscience provisions.  42 U.S.C. §§ 18041, 1302, 1395w–26.  But HHS does not have rulemaking authority to change, add to, or subtract from conscience provisions in other statutes such as the Church and Weldon Amendments.

Defendants further mistakenly rely on their "housekeeping authority" to support their authority to promulgate the rule.  None of the statutes cited by defendants provide HHS with the authority to promulgate substantive rules.  For example, 5 U.S.C. § 301 states:

> The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

The Supreme Court and our court of appeals has found this statute to empower an agency to create rules regarding internal procedure, practice, or organization, not substantive rules. *Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979); *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 777 (9th Cir. 1994).  The challenged rule is not, however, a mere

housekeeping rule.  The expansive definitions in the rule depart from the federal statutes, as explained above, changing the rights and responsibilities of health care providers.  Coupled with the addition of the termination of all HHS funding as a consequence of noncompliance, the rule is undoubtedly substantive.

HHS next cites Section 121(c) of Title 40 of the United States Code, which provides the General Services Administrator (GSA) with authority to promulgate the Federal Acquisition Regulation.  Section 121(d) goes on to state that the GSA does not have "the authority to prescribe regulations on matters of policy applying to executive agencies."  Statements on matters of policy are generally those that explain how an agency will enforce a statute or regulation.  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014).

HHS also invokes the Uniform Administrative Requirements (UAR).  The UAR is the Office of Management and Budget's (OMB) guidance for funding instruments.  In relevant part, the UAR provides agencies with the authority to ensure that federal funding programs are implemented in full accordance with federal statutory and public policy requirements.  While it is true that the UAR also provides agencies with the authority to require fund recipients to comply with federal statutes and regulations, it only allows for termination of an entity's "federal award," which is defined as "Federal financial assistance," in instances of noncompliance.  45 C.F.R. § 75.371(c).  This means failure to comply under the UAR would only allow HHS to terminate limited categories of funding such as grants, loans, and insurance.  Under the new rule, however, failure to comply would allow HHS to terminate all of an entity's funding including Medicaid and Medicare reimbursements.  For California, this would mean a single instance of noncompliance could jeopardize, for example, the $63 billion in federal funding it receives for healthcare programs for one-third of Californians.  There is no federal statute, UAR or otherwise, that delegates to HHS the authority to promulgate a rule with such draconian mechanisms.

**United States District Court**
For the Northern District of California

### B.   Implicit Rulemaking Authority.

Nor do defendants have implicit authority to promulgate the instant rule.  The Supreme Court has discussed the manner in which Congress may implicitly delegate legislative authority to an agency:

> Congress [] may not have expressly delegated authority or responsibility to implement a particular provision or fill a particular gap.  Yet it can still be apparent from the agency's *generally conferred authority and other statutory circumstances* that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law.

*United States v. Mead Corp.*, 533 U.S. 218, 229 (2001) (emphasis added).  In other words, Congress may implicitly authorize an agency to promulgate a legislative regulation if it is apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when addressing ambiguity in a statute it administers.  Such authorization may be indicated by express congressional delegation of rulemaking or adjudicative authority, or by some other indication of comparable congressional intent.

To show this, HHS refers back to the UAR as well as 5 U.S.C. § 301 and 40 U.S.C. § 121(c) for the collective proposition that HHS has the authority to disburse funds and to condition such funds based on compliance with federal conscience provisions.  There, nonetheless, exists a disconnect between HHS's ability to condition funds based on compliance with the law versus any ability to change the law.  HHS attempts to bridge that disconnect by explaining that, if HHS can and sometimes must condition funds based on compliance with the statutes it administers, "it follows from these authorizations that HHS may . . . explain its interpretation of those statutes" (*State of California*, Dkt. No. 54 at 13).

True, any and all agencies must interpret the statutes under their care.  But if their interpretations are wrong, then a court must set them aside.  This order holds that Congress has not made any express or implicit delegation of authority for HHS to issue legislative rules (excepted in limited cases already cited) and thus it has no authority to add to the requirements of the underlying statutes.  This order also holds that while HHS may interpret the statutes in

1    question, those interpretations may not add to or subtract from what the statutes themselves say.

2    This order further holds that the rule in question does exactly that by adding expansive

3    definitions in conflict with the statutes and imposing draconian financial penalties.

4      **4.**  **RELIEF.**

5      When a rule is invalid, "[t]he reviewing court shall — hold unlawful and set aside agency

6    action, findings, and conclusions found to be — (A) arbitrary, capricious, an abuse of discretion,

7    or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege,

8    or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory

9    right . . . . " 5 U.S.C. § 706(2). For the foregoing reasons, this order holds the rule is "not in

10   accordance with law," by reason of conflict with the underlying statutes and is in conflict with

11   the balance struck by Congress in harmonizing protection of conscience objections vis-a-vis the

12   uninterrupted flow of health care to Americans. When a rule is so saturated with error, as here,

13   there is no point in trying to sever the problematic provisions. The whole rule must go.

14     HHS has requested that the relief granted, if any, be limited to the parties. This order

15   recognizes that in the past, our court of appeals has vacated nationwide preliminary injunctions

16   when the record only demonstrated the impact the ruling would have on plaintiffs and not on the

17   nation as a whole or when limited relief was sufficient to provide complete relief to the

18   plaintiffs. *See, e.g., City & Cty. of San Francisco v. Trump,* 897 F.3d 1225, 1244–45 (9th Cir.

19   2018); *California v. Azar,* 911 F.3d 558, 582–84 (9th Cir. 2018).

20     Those cases did not, however, involve motions for summary judgment in which an entire

21   rule was finally set aside, as here. The rule is not being enjoined or severed. It is being vacated

22   in its entirety based on the administrative record and not on any considerations specific to the

23   plaintiffs. Importantly, HHS does not and cannot cite to instances where a rule has been vacated

24   in its entirety, but limited only to the parties. All of the courts that have been presented with the

25   possibility of such a remedy have rejected it. *E.g., O.A. v. Trump*, 2019 WL 3536334, at *29

26   (D.D.C. Aug. 2, 2019) (Judge Randolph Moss); *Desert Survivors v. U.S. Dep't of the Interior*,

27   336 F. Supp. 3d 1131, 1134 (N.D. Cal. 2018). When reviewing courts have determined that a

28   rule is facially invalid, the result is that the rule is vacated, "not that their application to the

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d

2    1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir.

3    1989)); *see also Make the Rd. N.Y. v. McAleenan*, 2019 WL 4738070, at *49 (D.D.C. Sept. 27,

4    2019) (Judge Ketanji Brown Jackson) (finding that relief must not just be granted to the

5    plaintiffs but to anyone to whom it could apply "so as to give interested parties (the plaintiff, the

6    agency, and the public) a meaningful opportunity to try again").

7           Setting aside the rule just for the plaintiffs in this case would not only go against the

8    foregoing precedent, but would also be illogical given the fact that the APA violations found

9    here would apply with equal force for any other plaintiff to whom the rule could apply.  A rule

10   cannot be vacated in its entirety on the ground that it is "not in accordance with law" for a

11   limited group of parties only.  It can only be vacated as to all applicable parties.  And limiting

12   relief would be especially illogical here given the fact that other courts have set aside the rule

13   already.[4]

14          In light of the fact that the rule is vacated in its entirety, this order will and need not reach

15   the remaining constitutional claims.

16          **5.      REQUESTS FOR JUDICIAL NOTICE, USE OF DECLARATIONS, AND**

17                  **MISCELLANEOUS MOTIONS.**

18          Federal Rule of Evidence 201(b) permits courts to take judicial notice of any fact "that is

19   not subject to reasonable dispute because it . . . can be accurately and readily determined from

20   sources whose accuracy cannot reasonably be questioned."  While a court may take judicial

21   notice of matters of public record at the motion to dismiss stage, it cannot take judicial notice of

22   disputed facts contained in such public records.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d

23   988, 999 (9th Cir. 2018).

24          Plaintiffs request judicial notice of the following documents:  (1) the HHS Budget,

25   (2) the HHS Guidelines for Regulatory Impact Analysis (2016), (3) the FDA's "Importance of

26

27          [4]  On November 6, 2019, the United States District Court for the Southern District of New York

28   vacated the rule in its entirety on a nationwide basis.  *State of New York, et al. v. U.S. Dep't of Health & Human Servs.*, C 19-04676 (Dkt. No. 248).

Influenza Vaccination for Health Care Personnel," (4) HHS, Office of Population Affairs, definition of "sterilization," (5) HHS "Factsheet, Final Conscience Regulation," (6) White House, Remarks by President Trump at the National Day of Prayer Service, (7) excerpts from the congressional record from the 93rd Congress (Senate), and (8) excerpts from the congressional record from the 109th Congress (House of Representatives).  Because these documents are appropriate subjects of judicial notice, plaintiffs' unopposed request is **GRANTED**.  Plaintiffs' administrative motion to request judicial notice and their request to judicially notice the transcript of oral arguments of the *State of New York* case is also **GRANTED**.  The transcript contains clarifications and concessions regarding the scope of the text of the rule that were relevant to this Court's decisionmaking.

The government has also opposed plaintiffs' use of declarations in their briefing. These declarations were not relevant in the determination of the Administrative Procedures Act claims and is thus **DENIED AS MOOT**.

The motions for preliminary injunction (*City and County of San Francisco* Dkt. No. 14; *State of California* Dkt. No. 11; *County of Santa Clara* Dkt. No. 36) and the State of California's administrative motion for leave to exceed the page limit for their preliminary injunction motion (Dkt. No. 12) are **DENIED AS MOOT**.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss and for summary judgment is **DENIED**.  To the extent stated above, plaintiffs' motion for summary judgment is **GRANTED.**

The challenged rule is set aside and shall be unenforceable.  This order gives plaintiffs substantially all the relief they seek, although it has not reached all the claims tendered. The undersigned judge accordingly believes this action is ready for appeal, and suggests that all sides stipulate to entry of final judgment with reservation of all issues not reached in this order in the event of a remand.

**IT IS SO ORDERED.**

Dated:  November 19, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE